**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT FOR USE IN THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| In re: | | Chapter 11 |
|---|---|---|
| **MN AIRLINES, LLC d/b/a SUN COUNTRY AIRLINES,** <br><br> Debtor. | ) ) ) ) ) ) | **Case No. 08-35197 (RJK)** |
| **In re** <br><br> **MN AIRLINE HOLDINGS, INC.,** <br><br> Debtor | | **Chapter 11** <br><br> **Case No. 08-35198 (RJK)** |

## DEBTORS' DISCLOSURE STATEMENT
## APRIL 5, 2010

## INTRODUCTION AND SUMMARY

## OVERVIEW

On October 6, 2008, MN Airlines, LLC d/b/a Sun Country Airlines, a Minnesota limited liability corporation ("Debtor" , "Company" or "Sun Country"), and its parent, MN Airline Holdings, Inc. a Minnesota corporation ("Parent" and together with Sun Country, the "Debtors"), filed petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). On April 5, 2010, the Debtors filed their Joint Plan of Reorganization under chapter 11 of the United States Bankruptcy Code (the "Plan").[1]

The purpose of this Disclosure Statement is to provide the Debtors' Creditors and holders of Equity Interests with adequate information to make an informed judgment about the Plan.

---

1   Capitalized terms used herein but not defined have the meaning ascribed to those terms under the Plan.

This information includes, among other matters, a brief history of the Debtors, a summary of their Chapter 11 Cases, a description of the Debtors' assets and liabilities, and an explanation of how the Plan will function.

Sun Country filed this case because it faced a severe cash shortage. Historically, Sun Country's working capital needs had been provided by loans from its shareholders and affiliates, including entities owned and controlled by Thomas Petters. In late September 2008, Mr. Petters was arrested and charged with fraud in connection with an alleged Ponzi scheme. A receiver was appointed by the United States District Court to collect and oversee all of Mr. Petters' assets. As a direct result of these events, Sun Country was unable to continue to borrow from other companies owned by Mr. Petters and was unable to pay its debts as they came due.

Since filing this case Sun Country has been able to restructure its operations to operate profitably and accumulate enough cash to meet its working capital needs and to make the payments required under the Plan. Consequently, Debtor and its Creditors Committee have determined that the Plan is the best alternative for creditors. In essence, the Plan provides for payment in cash of a portion of the Unsecured Claims of Creditors in a Convenience Class, with the remaining holders of larger Unsecured Claims becoming the owners of the airline.

MN Holdings has no operations of its own and acts solely as the holding company for Sun Country. The Joint Plan provides certain tax and other economic advantages for Creditors of both Estates. Accordingly, the Debtors, with the consent of the Creditors Committee, filed this joint Plan to combine the Estates for plan purposes only.

**The Debtors and the Creditors Committee endorse the Plan and request that each Creditor cast its ballot in favor of confirmation of the Plan.**

It is important that Creditors and read and carefully consider this Disclosure Statement and the Plan, and that Creditors vote promptly on the acceptance of the Plan. Debtors believe that the transactions contemplated by the Plan will yield a recovery to Creditors greater than the return that could be achieved through other restructuring alternatives or liquidation under Chapter 7 of the Bankruptcy Code.

YOU SHOULD READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS OF THE PLAN, BUT THE PLAN ITSELF IS THE GOVERNING DOCUMENT. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

If you have any questions concerning the procedures for voting or concerning your treatment under the Plan, please contact legal counsel to Debtor, Michael L. Meyer, Ravich Meyer Kirkman McGrath Nauman & Tansey, A Professional Association, 4545 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402, telephone number (612) 332-8511, facsimile number (612) 332-8302, or legal counsel to the Committee, Fruman Jacobson, Sonnenschein Nath & Rosenthal, LLP, 233 South Wacker Drive, Suite 7800, Chicago, Illinois 60606-6404, telephone number (312) 876-8123; or Carole Neville, Sonnenschein Nath &

Rosenthal, LLP 1221 Avenue of the Americas, New York, New York 10020-1089, telephone number (212) 768-6889.

A SUMMARY DESCRIPTION OF THE CLASSIFICATION OF YOUR CLAIM OR EQUITY INTEREST AND THE TREATMENT PROPOSED UNDER THE PLAN ARE CONTAINED UNDER ARTICLES 1 AND 2 BEGINNING ON PAGE 5. A COMPLETE COPY OF THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1**.

The Debtors reserve the right to amend, modify, or supplement the Plan at any time before the confirmation of the Plan, provided that such amendments or modifications do not materially alter the treatment of, or distributions to, Creditors and holders of Equity Interests under the Plan.

THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT THE DEBTORS' ESTIMATES OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS MORE FULLY DESCRIBED BELOW, SOME OR ALL OF WHICH MAY NOT BE REALIZED. NONE OF THE FINANCIAL ANALYSES CONTAINED IN THIS DISCLOSURE STATEMENT ARE CONSIDERED TO BE A "FORECAST" OR "PROJECTION" AS TECHNICALLY DEFINED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE USE OF THE WORDS "FORECAST," "PROJECT," OR "PROJECTION" WITHIN THIS DISCLOSURE STATEMENT RELATE TO THE BROAD EXPECTATIONS OF FUTURE EVENTS OR MARKET CONDITIONS AND QUANTIFICATIONS OF THE POTENTIAL RESULTS OF OPERATIONS UNDER THOSE CONDITIONS.

ALL FINANCIAL INFORMATION PRESENTED IN THIS DISCLOSURE STATEMENT WAS PREPARED BY THE DEBTORS WITH THE ASSISTANCE OF THE PROFESSIONAL FINANCIAL ADVISORS TO THE DEBTORS AND THE CREDITORS COMMITTEE. EACH CREDITOR AND EQUITY INTEREST HOLDER IS URGED TO REVIEW THE PLAN IN FULL BEFORE VOTING ON THE PLAN TO ENSURE A COMPLETE UNDERSTANDING OF THE PLAN AND THIS DISCLOSURE STATEMENT.

CERTAIN STATEMENTS, PROJECTIONS OF FUTURE OPERATING RESULTS, VALUATION ESTIMATES AND THE LIKE CONTAINED IN THIS DISCLOSURE STATEMENT AND ELSEWHERE ARE STATEMENTS THAT THE DEBTORS BELIEVE CONSTITUTE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH FORWARD-LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF THE REORGANIZED DEBTORS, OR INDUSTRY RESULTS, TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. SUCH RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS INCLUDE, AMONG OTHERS: GENERAL ECONOMIC AND

BUSINESS CONDITIONS; COMPETITION; LOSS OF ANY SIGNIFICANT CUSTOMERS; CHANGES IN BUSINESS STRATEGY OR DEVELOPMENT PLANS; AVAILABILITY, TERMS AND DEPLOYMENT OF CAPITAL; ADVERSE UNINSURED DETERMINATIONS IN ANY EXISTING OR FUTURE LITIGATION OR REGULATORY PROCEEDINGS AND ANY OTHER FACTORS REFERENCED IN THIS DISCLOSURE STATEMENT OR OTHERWISE. SEE "RISK FACTORS." THESE FORWARD-LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THE DEBTORS EXPRESSLY DISCLAIM ANY OBLIGATION OR UNDERTAKING TO DISSEMINATE ANY UPDATES OR REVISIONS TO ANY FORWARD-LOOKING STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT TO REFLECT ANY CHANGE IN THE DEBTORS' OR REORGANIZED DEBTORS' EXPECTATIONS WITH REGARD TO SUCH STATEMENTS OR ANY CHANGE IN EVENTS, CONDITIONS OR CIRCUMSTANCES ON WHICH ANY SUCH STATEMENT IS BASED.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS, EQUITY INTEREST HOLDERS AND OTHER PARTIES IN INTEREST AND FOR THE SOLE PURPOSE OF ASSISTING THEM IN MAKING AN INFORMED DECISION ABOUT THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS IN CONJUNCTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR IN THE BALLOTS. IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION TO PERMIT CREDITORS AND HOLDERS OF EQUITY INTERESTS TO VOTE ON THE PLAN. APPROVAL OF THE LEGAL ADEQUACY OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT IS NOT A CERTIFICATION BY THE BANKRUPTCY COURT AS TO THE TRUTH OR ACCURACY OF THE FACTUAL MATTERS THAT ARE CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS AND THE COMMITTEE STRONGLY URGE YOU TO VOTE FOR THE PLAN AS THEY BELIEVE THAT THE PLAN WILL PROVIDE FOR A LARGER DISTRIBUTION TO HOLDERS OF CLAIMS THAN WOULD OTHERWISE RESULT IF AN ALTERNATIVE RESTRUCTURING PLAN WERE PROPOSED OR THE DEBTORS' ASSETS WERE LIQUIDATED.

# SUMMARY OF CLASSIFICATION

The Plan divides the Claims of known Creditors and holders of Equity Interests into Classes and sets forth the treatment afforded to each Class. Table 1 below sets forth the specific classification and treatment under the Plan of each of the Classes. The classification of Claims and the distributions to be made under such classification takes into account the relative priorities of Claims and Equity Interests. The Debtor believes that it has classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code.

If the Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim will receive the same treatment as all holders of other Allowed Claims in the same Class, regardless of whether a particular holder voted to accept the Plan. Moreover, upon confirmation, the Plan will be binding on all Creditors and holders of Equity Interests regardless of whether such Creditors or holders of Equity Interests voted to accept the Plan.

In accordance with Section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors and holders of Equity Interests (except those Unclassified Claims receiving treatment as set forth in Article 2) are placed in the Classes described below for all purposes, including voting on, confirmation of, and distribution under, the Plan:

## TABLE 1 – CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

| | | |
|---|---|---|
| Unclassified | Allowed Administrative Claims | |
| Unclassified | Preserved Ordinary Course Administrative Claims | |
| Unclassified | Allowed Priority Unsecured Tax Claims | |
| Unclassified | Post-Confirmation Professional Fees | |
| Unclassified | U.S. Trustee Fees | |
| Class 1 | Priority Non-Tax Claims | Unimpaired, deemed to accept |
| Class 2 | Secured Claims | Unimpaired, deemed to accept |
| Class 3 | Other Unsecured Claims | Unimpaired, deemed to accept |
| Class 4 | Convenience Claims | Impaired, entitled to vote |
| Class 5 | General Unsecured Claims | Impaired, entitled to vote |
| Class 6A | Equity Interests in Parent | No distribution, deemed to reject |
| Class 6B | Equity Interests in Sun Country | No distribution on account of Equity |

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

The following describes the Plan's classification of Claims against the Debtor and Equity Interests in the Debtors and the treatment the holders of Allowed Claims and Allowed Equity Interests would receive under the Plan. The treatment of Claims set forth below is consistent with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.

**1.1    Administrative Claims and Professional Fee Claims**.  Allowed Administrative Claims shall be paid by the Reorganized Debtor within ten (10) days after the Effective Date.  Allowed Professional Fee Claims shall be paid within ten (10) days after the Allowance Date:  (i) first from the balance of any retainers, if any, held by Professionals until fully exhausted, and (ii) then by the Reorganized Debtor.  To the extent a Professional holds a retainer balance after satisfaction of its Allowed Professional Fee Claim, such Professional shall promptly deliver the retainer balance to the Reorganized Debtor.  Administrative Claims, including the cost to cure defaults under assumed executory contracts, are estimated to total $1,740,000[2] on the Effective Date.  Professional Fee Claims are estimated to total $530,000 on the Effective Date.

**1.2    Administrative Claims**.  Each Allowed Ordinary Administrative Claim shall be paid by the Reorganized Debtor in accordance with either: (a) the terms and conditions under which such Claim arose or (b) in the ordinary course of Reorganized Debtor's business. Such payments are to be made by the Reorganized Debtors without further action by the holder of such Claim.  Non Ordinary Course Claims must file request for payment by the Administration Claim Bar Date, described below.

**1.3    Allowed Priority Tax Claims**.  Each Allowed Priority Tax Claim, if any, will be paid in full, in cash, either (i) on the Effective Date (or as soon thereafter as is practicable after any such Claim is allowed) or (ii) at the Debtor's option, in equal quarterly payments over a period not exceeding five years after the date of the order for relief entered against the Debtor in accordance with Bankruptcy Code section 1129(a)(9)(C), together with simple interest at the rate of [   ]  % per annum from the Effective Date.   Priority Tax Claims are estimated to total $375,000.

**1.4    U.S. Trustee Fees**.  All fees payable pursuant to 26 U.S.C.§1930(a)(6) shall be paid on the Effective Date by the Debtors.  Any such fees accruing after the Effective Date but prior to the closing of the Chapter 11 Cases shall be paid by the Reorganized Debtors.

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims against any Debtor are not classified for purposes of voting on, or receiving Distributions under, the Plan. Holders of such Claims are **NOT** entitled to vote on the Plan. All such Claims are instead treated separately in accordance with Section 2 of the Plan and in accordance with the requirements set forth in Section 1129(a)(9)(A) of the Bankruptcy Code.

**1.5    Bar Dates for Unclassified Claims**.  The Plan proposes the establishment of the following bar dates for certain Unclassified Claims:

**Administrative Claim Bar Date**.  All requests for payment of Administrative Claims (except for Professional Fees, Cure Claims, and Operations Administrative Claims) must be filed by the Administrative Claim Bar Date and served on the Debtors and the Committee, or the holders thereof shall be forever barred from asserting such

---

2    Petters Aircraft Leasing, LLC an affiliate of the Debtors, has filed an Administrative Claim of $2,120,000 for unpaid aircraft rent during this Case.  The Claim is disputed and the figure above does not include any payment on this Administrative Claim.

Administrative Claims and shall not be entitled to any Distributions under the Plan. The Administrative Claim Bar Date is August 15, 2010.

**Professional Fee Bar Date**. All requests for payment of Professional Fees arising on or before the Effective Date shall be filed with the Bankruptcy Court and served on the Debtor and the Committee within 30 days following the Effective Date. Any Professional Fees for which an application or request for payment is not filed within that time period shall be deemed discharged and forever barred, and shall not be entitled to any Distribution under the Plan.

**1.6** **Class 1 – Priority Non-Tax Claims**. Class 1 consists of all Priority Non-Tax Claims.

**Treatment**. All Allowed Priority Non-Tax Claims not previously paid will be paid in full, in cash (except to the extent that the holder of such Claim agrees to a different treatment) on the Effective Date or as soon thereafter as is practicable after such Claim becomes an Allowed Priority Non-Tax Claim. The legal, equitable and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. Priority Non-Tax Claims are estimated to total $43,000.

**Voting**. Class 1 is unimpaired and the holders of Class 1 Claims are conclusively deemed to have accepted the Plan.

**1.7** **Class 2 – Secured Claims**. Class 2 consists of Secured Claims as follows:

**2A—City of Los Angeles, Los Angeles World Airports.** This Claim is for landing and other airport fees secured by a letter of credit issued by Alliance Bank in the sum of $152,028. The Claim is in the sum of $12,378.46 and is fully secured.

**Treatment:** The holder of the Class 2A claim shall receive payment of that Claim in cash on the Effective Date.

**2B—JFK International Airport, LLC.** This Claim is for landing and other airport fees secured by a letter of credit issued by Alliance Bank in the sum of $90,000. The Claim is in the sum of $25.24 and is fully secured.

**Treatment:** The holder of the Class 2B claim shall receive payment of that Claim in cash on the Effective Date.

**2C—Port Authority of NY & NJ-JFK.** This Claim is for landing and other airport fees secured by a letter of credit issued by Alliance Bank in the sum of $90,000. The Claim is in the sum of $25,364.16 and is fully secured.

**Treatment:** The holder of the Class 2C claim shall receive payment of that Claim in cash on the Effective Date.

**2D—<u>Swissport USA, Inc.</u>**  This Claim is for services rendered secured by a letter of credit issued by Alliance Bank in the sum of $33,000. The amount of the Claim exceeds $33,000 so the Secured Claim of this holder is in the sum of $33,000.

**Treatment:**  The holder of the Class 2D claim shall receive payment of that Claim in cash on or after the Effective Date by making a draw on the letter of credit which secures the Claim.

**Voting.**  Class 2 is unimpaired, and the holders of Allowed Secured Claims are conclusively deemed to have accepted the Plan. All Secured Claims shall be subject to allowance under the provisions of the Plan.

**1.8**     **<u>Class 3 – Other secured Claims</u>.**  Class 3 consists of all Other Secured Claims.

**Treatment.**  Each holder of an Other Secured Claim shall receive such treatment as will render the Claim unimpaired within the meaning of Section 1124 of the Bankruptcy Code on the Effective Date. The failure to object to any Other Secured Claim in the Case shall be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Other Secured Claim. The Debtors do not believe there are any Claims in this class. Debtor believes there are no claims in this Class.

**Voting.**  Class 3 is not impaired and the holders of Allowed Other Secured Claims are conclusively deemed to have accepted the Plan.

**1.9**     **<u>Class 4 –Convenience Claims</u>**.  Class 4 consists of all Convenience Class Claims. These are claims that are $50,000 or less or which have been voluntarily reduced by the holder thereof.

**Treatment**.  Each holder of an Allowed Convenience Claim shall receive on the Effective Date, or as soon thereafter as is practicable, in full and complete satisfaction, settlement and release of and in exchange for such allowed Convenience Claim cash equal to 20% of such Allowed Convenience Claim. Debtor estimates that the Claims in this Class total $1,275,000.

**Voting**.  Class 4 is impaired and the holders of Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

**1.10**     **<u>Class 5.  Unsecured Claims</u>.**  Class 5 consists of all Unsecured Claims.

**Treatment.**  Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Unsecured Claim in full and complete satisfaction, settlement and release of and in exchange for such Allowed Unsecured Claim shall receive 100 shares of New Common Stock for each $1,000 of Allowed Claim on the Initial  Distribution Date. Holders of Allowed Unsecured Claims may elect to reduce

their Claims to be treated in Class 4 Convenience Claims. Debtor estimates Claims in this Class to total $80 million.

**Voting**. Class 5 is impaired and the holders of Allowed Unsecured Claims are entitled to vote to accept or reject the Plan.

**1.11** **Class 6 – Equity Interests**. Class 6A consists of all Equity Interests in Sun Country. Class 6B consists of all Equity Interests in MN Holdings.

**Treatment of Sun Country Equity Interests.** For the benefit of the holders of New Common Stock and not on account of its Equity Interests in Sun Country, MN Holdings shall retain its interests in Sun Country.

**Treatment of Sun Country Equity Interests.** Holders of Class 6A Equity Interests in Sun Country will not receive or retain any distribution or other property under the Plan. Equity Interests in Sun Country will be retained for the benefit of Creditors.

**Voting.** Class 6A and B is impaired. Because holders of Equity Interests in Class 6A and B will neither receive nor retain any distribution or Property under the Plan on Account of their Equity Interest, Classes will be deemed to have voted to reject the Plan.


## VOTING AND CONFIRMATION PROCEDURES

**2.1** **Enclosures**. This Disclosure Statement is accompanied by a copy of Debtors' Plan of Reorganization dated April 5, 2010.

**2.2** **Ballots**. The Ballots are to be used by holders of Claims in Classes 4 and 5. Class 5 Creditors may make the Election on the Ballot to reduce their Claims to Convenience Class Claims. Holders of Unclassified Claims and Claims or Interests in Classes 1, 2, and 3 are unimpaired under the Plan and are deemed to have accepted the Plan without voting.

**2.3** **Who May Vote**. Under the Bankruptcy Code, impaired Classes of Claims or Equity Interests are entitled to vote to accept or reject a plan of reorganization. A Class that is not impaired under a plan is deemed to have accepted a Plan and is not entitled to vote. Generally, a Class is "impaired" under the Bankruptcy Code when the legal, equitable, and contractual rights of the holders of Claims or Equity Interests in that Class are modified or altered. For purposes of the Plan, holders of Claims in Classes3, 4A and 4B are impaired and entitled to vote on the Plan.

If, however, an objection is filed by any Debtor with respect to your Claim, you will have the responsibility to request that the Bankruptcy Court temporarily grant allowance of your Claim for voting purposes. Rule 3018 of the Federal Rules of Bankruptcy Procedure provides that the Bankruptcy Court after notice and hearing may temporarily allow the Claim in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the

Plan.  If an objection is filed by any Debtor with respect to your claim, you are urged to seek the assistance of an attorney with respect to this matter.

       **2.4**    **Voting Instructions**.  All votes to accept or reject the Plan must be cast by using the appropriate form of Ballot enclosed with this Disclosure Statement. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. All Ballots must be actually received by the Clerk of the Bankruptcy Court by 4:30 p.m. Central Time, on _____ (the "Voting Deadline"), unless the Bankruptcy Court extends such date before such time.

       For your vote to count, your Ballot must be properly completed according to the voting instructions on the Ballot and received no later than the Voting Deadline by the Clerk. Any Ballot not indicating an acceptance or rejection will be deemed an acceptance of the Plan.

       If you have any questions concerning the Plan or the packet you received, please contact:

             Michael L. Meyer
             Ravich Meyer Kirkman McGrath
             Nauman & Tansey, A Professional Association
             4545 IDS Center
             80 South Eighth Street
             Minneapolis, MN 55402
             Telephone:    (612) 332-8511
             Facsimile:     (612) 332-8302

             Fruman Jacobson
             Sonnenschein Nath & Rosenthal LLP
             233 South Wacker Dr.
             Suite 7800
             Chicago, IL 60606-6404
             Telephone:    (312) 876-8000
             Facsimile:     (312) 876-7934

             Carole Neville
             Sonnenschein Nath & Rosenthal LLP
             1221 Avenue of the Americas
             25th Floor
             New York, NY 10020
             Telephone:    (212) 768-6700
             Facsimile:     (212) 768-6800

**2.5    Acceptance or Rejection of the Plan**.  Under Section 1126 of the Bankruptcy Code, a Class of Claims entitled to vote is deemed to have accepted the Plan if it is accepted by creditors in such Class who, of those actually voting on the Plan, hold at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class that have accepted or rejected the Plan. A Class of Equity Interests entitled to vote is deemed to have accepted the Plan if it is accepted by holders of Equity Interests who hold at least two-thirds in amount of the Equity Interests of such Class that have actually voted on the Plan.

If the Plan is not accepted by all impaired Classes of Allowed Claims, the Plan may still be confirmed by the Bankruptcy Court under Section 1129(b) of the Bankruptcy Code if: (a) the Plan has been accepted by at least one impaired Class of Claims; and (b) the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class (the "Cramdown Provisions"). If the Plan is not accepted by all impaired Classes of Allowed Claims or Equity Interests, the Debtor reserves the right to ask the Bankruptcy Court to confirm the Plan under the Cramdown Provisions.

**2.6    Confirmation Hearing; Objections.**  Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan. Under Section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing before the Honorable Robert J. Kressel, Courtroom 8W, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, at _____ C.D.T. on _____. A notice (the "Confirmation Hearing Notice") setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

Any objection to Confirmation of the Plan must be in writing, must comply with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and must be filed and served as required in the Confirmation Hearing Notice.

## BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING

**3.1    Overview of the Debtors' History and Business Operations.**  Sun Country Airlines was founded in 1982 by a group of pilots and flight attendants from the defunct Braniff International Airlines, with the help of several business investors from the Twin Cities of Minneapolis and St. Paul.  The fledgling airline flew Boeing 727 aircraft in charter service, primarily on flights to Las Vegas.  The company  prospered, eventually operating military and civilian charter flights around the globe using DC-10 aircraft, as well as domestic charter flights with the Boeing 727 aircraft.

In June, 1999, under new ownership, the company became a scheduled service carrier, and instituted an aggressive growth plan. The combination of intense industry price wars, and the terrorist attacks of September 11, 2001 created losses that the airline was unable to withstand, and the company ceased flying operations in December of 2001 and filed bankruptcy. Sun Country Airlines, Inc. was subsequently liquidated in Chapter 7 proceedings.

In January of 2002, a group of individual investors formed MN Airlines, LLC in order to purchase the primary assets of the airline, including the rights to the name "Sun Country Airlines" from the chapter 7 trustee. The Company then began recalling employees, and restarted operations under the new ownership in April of 2002. Now flying new generation Boeing 737 aircraft, the airline continued to build its scheduled service offering. The bulk of the Company's revenues were generated from first quarter flying from Minneapolis to warm weather destinations in Florida, Mexico and the Caribbean. The airline also partnered with the Riverside Casino in Laughlin, Nevada to provide year round service to that underserved destination. Despite a reputation for award winning customer service, the Company was profitable in only one year (2003) out of the first five after it restarted operations in 2002.

Two Twin Cities firms, hedge fund Whitebox Advisors, LLC and Petters Aviation, LLC (owned by Minneapolis businessman Thomas J. Petters) joined together to acquire the airline in November of 2006. The ownership of the airline was placed in the Parent, which in turn was owned by Whitebox Advisors, LLC, Petters Aviation, LLC and some individual passive investors. The new ownership group continued to focus on scheduled airline service, with a growth plan aimed at increasing the size of the fleet and attracting additional business travelers to the airline. In November 2007, Petters Aviation purchased all of the Whitebox Advisors' equity in the Company.

The airline continued to post significant losses into 2008. Record high fuel prices in the first half of 2008 resulted in operating losses of almost $20 million for the first six months of the year. A new Chief Executive Officer, Stanley Gadek, joined the Company in March of 2008, and began a number of initiatives to stem the losses at the airline. Scheduled service flying in consistently unprofitable markets was eliminated, or converted into seasonal operations. In order to help insulate the airline from the high fuel prices, the Company began to once again bid on, and fly, domestic military charter flights, where the price of fuel was essentially passed through to the Defense Department. The airline also began generating significant ancillary revenue, such as fees for checked baggage, and for on-board food service in coach class. The ancillary revenue initiatives were immediately successful, primarily because nearly all U.S. airlines had begun charging similar fees. The company also cut back its capacity to only seven aircraft operating in the summer of 2008, with a commensurate reduction in personnel. These initiatives returned the airline to marginal profitability by the end of the summer of 2008.

The story of Thomas J. Petters' activities, the criminal charges against him and his conviction are well known. Sun Country has been operating without any control or influence by Petters or the federal receiver appointed by the United States District Court. Sun Country expects to generate sufficient cash from operations to fund its business and obligations under the Plan.

**3.2    Sun Country's Need for Bankruptcy Protection.**    At the end of September, 2008, the government raided the offices of Petters Group Worldwide, and subsequently accused its owner, Thomas Petters, of conducting an extensive "Ponzi-style" scheme.   In late October 2009, Mr. Petters' trial on those charges commenced in Federal District Court in Saint Paul, Minnesota.   He was convicted on all counts in December 2009, and is awaiting sentencing.  Mr. Petters' arrest effectively cut off the airline from its expected short term financing, and Sun Country was forced to file the petition commencing this case on October 6, 2008, because it did not have sufficient cash on hand to operate through the traditionally slow fall season.

Just before the filing, in order to conserve cash, Sun Country instituted radical pay reductions for all employee groups through the end of the year. The airline also utilized the bankruptcy stay on aircraft rental payments to conserve cash for the first 60 days after filing, and to renegotiate some of the aircraft leases that contained above market rental rates.  Those measures along with the reduction in fuel prices were significant reasons the airline was able to continue operations throughout the fall and into the profitable winter season. By the end of April, 2009, Sun Country had repaid the employees their deferred wages, with interest, and the aircraft lessors were again made whole on their aircraft leases.

**3.3    Financial Statements**.   Attached as **<u>Exhibit 2</u>** to this Disclosure Statement are Income Statements and Balance Sheets of the Debtor for the prior fiscal years ending December 31, 2007, 2008, and 2009, and for the current fiscal year to date.

**3.4    Current Directors and Executive Officers**.

**Directors**.  Listed below in Table 3 are the names of each director of Debtor, the principal occupation for each director, and the year of commencement of each person's term as a director of Debtor.  As of the Effective Date of the Plan, Debtor's current directors will no longer serve in their appointed capacities except as disclosed in section 5.2 of this document.

**TABLE 3 – DEBTOR'S CURRENT DIRECTORS**

| Name | Principal Occupation and Business Experience Past 5 Years | Year of Commencement of Term |
|---|---|---|
| Stanley J. Gadek | Debtor's Chairman, President and Chief Executive Officer. Formerly Chief Financial Officer of Airtran Airways | 2008 |
| John S. Fredericksen | Debtor's Vice President, General Counsel, and Secretary | 2008 |
| Thomas S. Hay | Executive Vice President of Petters Group Worldwide, LLC | 2006 |
| William Dunlap | Former Chairman, PGW Media Group; former CEO of Campbell, Mithun | 2008 |

**Executive Officers**. Listed below in Table 4 are the names of each executive officer of Debtor, the job title for each executive officer, and the year of commencement of each person's term as an executive officer of Debtor.

**TABLE 4 – DEBTOR'S OFFICERS**

| Name | Job Title | Year of Commencement of Term |
|---|---|---|
| Stanley J. Gadek | Chairman, President and Chief Executive Officer | 2008 |
| John S. Fredericksen | Vice President and General Counsel | 2003 |

## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

**4.1    Commencement of the Chapter 11 Case.**  On October 6, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Chapter 11 Cases were assigned to the Honorable Robert J. Kressel, Judge, United States

Bankruptcy Court for the District of Minnesota. Since the Petition Date, Sun Country has continued to operate its business and manage its property as Debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code. MN Holdings has no operations.

No trustee has been appointed in the Chapter 11 Cases.

**4.2** **First Day Order**s. On or shortly after the Petition Date, the Bankruptcy Court entered several orders authorizing Sun Country to pay various prepetition claims and granting other relief necessary to help Sun Country stabilize its day-to-day business operations. These orders were designed to allow Sun Country to continue business operations with minimum disruptions and dislocations, and to ease the strain on its relationships with its employees and other parties. Included among the orders entered by the Bankruptcy Court were orders authorizing Sun Country to pay wages, salaries, employment taxes, employee benefit payments, and workers compensation payments and maintain certain bank accounts, cash management systems and business forms.

**4.3** **Appointment of Committee**. On October 9, 2008, the Office of the United States Trustee (the "**U.S. Trustee**") filed the Appointment of Committee of Unsecured Creditors in the Sun Country case. The Committee was initially comprised of Sun Minnesota Domestic/Foreign, LLC, Menzies Aviation, and Hallmark Aviation Services, LP as committee members. On October 16, 2008, the Air Line Pilots Association and Eleven Twenty Limited were added as members to the committee.

The Bankruptcy Court authorized the Unsecured Creditors' Committee to employ and retain Sonnenschein Nath & Rosenthal LLP as counsel, Garfinkle & Wang as financial consultant, Spence, Ricke, Sweeney & Gernes, P.A. as counsel.

**4.4** **Bar Dates for Filing Proofs of Claim**. The Bankruptcy Court set a deadline of March 11, 2009 for holders of Claims other than Governmental Units to file proofs of claim. April 6, 2009, was set as the deadline for Governmental Units to file proofs of claim.

**4.5** **Engagement of Raymond James**. In order to aid the Debtor in the restructuring of its business and to provide investment banking services in connection with the possible sale of Sun Country's business or the obtaining of DIP financing, Sun Country engaged Raymond James & Associates, Inc. ("Raymond James") as financial advisor. Raymond James has years of experience in the aviation business and in the restructuring of financially troubled companies. The Court approved the engagement on November 19, 2008.

**4.6** **Debtor-in-Possession Financing.** After the Petition Date, Sun Country faced a seasonal cash shortage and projected that it would not be able to meet operating expenses beginning in early December. Sun Country was able to negotiate a $4 million revolving credit line with its affiliate, Elite Landings, LLC, which also was a debtor-in-possession in a Chapter 11 case pending in the District of Minnesota, but which had cash available to make the needed loan. After notice and a preliminary hearing, on December 5, 2008, the Court granted the motion to approve that financing. A final order approving the financing was entered on December 18, 2008.

Sun Country borrowed only $1 million on the credit facility and was able to repay the loan in full by April 1, 2009. The Debtors have not needed additional financing during the case.

**4.7    Reconfiguration of Sun Country Fleet.**  At the commencement of the case, Sun Country fleet of aircraft consisted of nine leased 737-800 aircraft. As a result of negotiations with its aircraft lessors, four of those 737-800 aircraft have been returned to the lessors. Those four aircraft have been replaced with one 737-800 and two 737-700 aircraft, at lease rental terms which are based on much more favorable current market rates,  A third 737-700 aircraft has been leased and will join the fleet prior to the busy summer travel schedule, so that total fleet will once again total nine aircraft.  Sun Country has continued its practice of leasing supplemental aircraft from Transavia Airlines of the Netherlands in the winter months, with two aircraft leased from Transavia from December of 2009 through April 2010.

Sun Country obtained ETOPS approval from the Federal Aviation Administration in January. 2010, which  allows Sun Country Airlines to operate selected aircraft in its fleet on long distance over water operations. The airline plans to begin operations under this authority with one stop service between Minneapolis and London in the summer of 2010.

**4.8    Efforts to Sell Sun Country.**  During the Case, Raymond James, aided by Garfinkle and Wang, the Committee's financial advisor, conducted an exhaustive process to offer Sun Country for sale.  While interest was expressed by certain parties, no definitive offer was received.  The expressions of interest were in a price range, subject to adjustment as the result of diligence and post-offer operational results at Sun Country.  While no exact indication of value is possible from this experience, Sun Country believes that the indications of interest confirm a valuation in the range of $10 million to $30 million.

**4.9    Assumption and Rejection of Real Property Leases**.  From the Petition Date to May 4, 2009, the Debtors had the authority to assume or reject leases of real property under section 365(a) of the Bankruptcy Code subject to Bankruptcy Court approval.  The Bankruptcy Code establishes a deadline of 60 days after the Petition Date for the Debtor to designate such leases for assumption or rejection.  However, the Bankruptcy Court approved an extension of that deadline to May 4, 2009.

During the case, Sun Country rejected the Aircraft Hangar and Facility Lease with the Metropolitan Airports Commission dated September 2007, which was approved by the Court by order dated November 12, 2008.  That hangar was sublet to, and occupied by, Petters Aviation, LLC. On April 30, 2009, the Court entered an order approving Sun Country's assumption of the following leases of real property and the associated cure amounts under section 365 of the Bankruptcy Code:

| **Name of Lessor** | **Rental Location** | **Date** | **Cure Amount** |
|---|---|---|---|
| Ted Glasrud Associates, Inc. | HDQ – 1300 Mendota Heights Road | July 15, 2002 | $6,077.94 |

| | | | |
|---|---|---|---|
| RMS Properties, LLC | Hangar<br>7201 Longfellow Ave | September 7, 2004 | $13,903.52 |
| Milpitas Fleming Associates | Commissary<br><br>1408 Northland Dr | July 15, 2002 | $1,717.91 |
| MAC – Metropolitan Airport Commission (Airline Agmt & Terminal Building Lease) | MSP Terminal | January 1, 1999 | $458,994.19 |
| MAC – Metropolitan Airport Commission (Office Lease) | MSP Terminal | April 15, 2002 | $12,395.61 |
| DFW-Dallas/Ft. Worth Airport (Restated Use Agmt) | DFW Airport | April 1, 1997 | $353.27 |
| Port of Seattle (Signatory Lease / Operating Agmt 2006-2012) | SEA-TAC Airport | January 1, 2006 | $75,525.22 |
| Port Authority of NY & NJ (Port Authority Lease) | JFK Airport<br>Terminal 4 at JFK | September 1, 2006 | $0.00 |
| City of Los Angeles (Airline Terminal Space Lease and License Agmt) | LAX Airport | October 14, 2002 | $12,377.86 |
| City of Phoenix (Airport Facilities Sharing Agmt) | PHX Airport | July 28, 2004 | $9,145.17 |
| San Diego County (Operating and Lease Agreement) | SAN Airport | May 22, 2002 | $0.00 |

| | | | |
|---|---|---|---|
| Greater Orlando Aviation Authority (Operating Agmt) | MCO Airport | April 15, 2002 | $54,438.00 |
| City of Houston (Letter Agmt) | IAH Airport | June 6, 2002 | $1,864.20 |
| City / County of Denver (Operating Agmt) | Denver International Airport | June 6, 2005 | $6,394.55 |
| General Mitchell A/P (Letter Agmt) | General Mitchell International Airport Milwaukee | October 28, 2002 | $3,080.91 |
| Puerto Rico Ports Authority (Operating Agmt) | Louis Munoz Int'l Airport | August 25, 2002 | $0.00 |
| Mohave County Airport (Use Permit) | Laughlin/Bullhead Int'l Airport | March 19, 2003 | $9,850.32 |

## IMPLEMENTATION OF THE PLAN

**5.1    Amendment of Debtors' Governance Documents**.  The Debtors' articles of incorporation and bylaws (or analogous governance documents) shall be amended and all necessary action shall be taken to:

> prohibit the issuance of nonvoting equity securities, and providing, as to the class(es) of securities possessing voting power, an appropriate distribution of such power among such class(es), including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends; and

> provide for such provisions, terms, and conditions necessary to comply, conform with, and implement the terms, conditions, and requirements of the Plan.

**5.2    Governance of the Reorganized Debtor.**  The New Board of Sun Country shall consist of seven members, one of which shall be the chief executive officer of Sun Country.  The other members of the Board shall be chosen by the holders of Class 5 Claims and the Committee

and disclosed within twenty (20) days prior to the Confirmation Hearing. The governance and ownership structure of the Reorganized Debtor will be reviewed by the U.S. Department of Transportation and must be approved by that agency before the Confirmation Date.

**5.3    Feasibility of the Plan.**  Sun Country has completed its 2010 business plan and related projections. A copy of the projections is attached hereto as **Exhibit 3**. The projections demonstrate that the Debtors will be profitable and capable of performing their obligations under the Plan.

**5.4    Plan Consolidation.**  The Plan proposes and its terms embody a resolution of certain intercreditor issues relating to whether the liabilities and properties of the Debtors should be consolidated solely for purposes of distributions under the Plan, including whether each Estate should be considered separately for purposes of making distributions under the Plan to the holders of Claims and the amount and priority of Intercompany Claims. Solely for purposes of distributions under the Plan, (a) the separate Chapter 11 Cases shall be consolidated into a single case; (b) all property of the Estate of each Debtor shall be deemed to be property of the consolidated estates; (c) no distributions shall be made on any Intercompany Claims, and (d) all claims based on co-Debtor guaranties or other bases of co-Debtor liability shall be cancelled. The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distributions under the Plan.

**5.5    Section 1145 Determination**.  Confirmation of the Plan shall constitute a determination, in accordance with section 1145 of the Bankruptcy Code, that except with respect to an entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, Section 5 of the Securities Act of 1933 and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, broker or dealer in, a security do not apply to the offer, sale, or issuance under the Plan of the New Common Stock.

**5.6    Revesting of Assets**.  Subject to the provisions of the Plan, all Estate Property shall vest in Reorganized Debtors on the Effective Date. As of the Effective Date, all Estate Property shall be free and clear of all Liens, Claims, and Equity Interests, except for any Liens preserved under the Plan. From and after the Effective Date, Reorganized Debtor may operate its business, and may use, acquire, and dispose of its Property free of any restrictions of the Bankruptcy Code.

**5.7    Discharge**. Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims against the Debtors or Estate Property and termination of all Equity Interests. Except as provided in the Plan or the Confirmation Order, on the Effective Date: (a) the Debtors and Reorganized Debtor shall be discharged from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (i) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b)

all Equity Interests and other rights of Equity Interests in the Debtor shall be terminated, except for the New Common Stock as expressly provided in the Plan. Except as otherwise provided in the Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors arising before the Effective Date. Pursuant to Bankruptcy Code section 524, the discharge granted under this section shall avoid any judgment against the Debtors at any time obtained (to the extent it relates to a discharged claim), and operates as an injunction against the prosecution of any action against the Debtors and Estate Property (to the extent such action related to a discharged claim).

**5.8** **Injunction**. Except as provided in the Plan, the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is terminated under the Plan are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts, liabilities, or terminated Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtor (including any officer or director acting as a representative of the Debtors or Reorganized Debtor) to the extent that such action or proceeding arises from any act or omission of such party in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation and pursuit of Confirmation of the Plan or the consummation of the Plan except for the Debtors' acts or omissions constituting gross negligence or willful misconduct as finally determined by a court of competent jurisdiction; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Debtors, Reorganized Debtor, or their respective property; (c) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, Reorganized Debtor, or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Reorganized Debtor, or their respective property; and (e) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

**5.9** **Exculpation**. The Debtors, the Creditors Committee and members thereof and each of their respective officers, directors, employees, representatives, counsel, financial advisors, and agents, shall not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date in connection with or related to the Debtors, or the Chapter 11 Cases, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement, or any contract, instrument, release or other arrangement entered into or any action taken or not taken in connection with the Plan or the Chapter 11 Cases; or (iii) any distributions made pursuant to the Plan except for acts constituting willful misconduct, gross negligence or breach of fiduciary duty, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**5.10** **Retention of Jurisdiction**. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court retains such jurisdiction over the

Chapter 11 Cases after the Effective Date as is legally permissible including, without limitation, jurisdiction to:

to determine objections to the allowance of Claims;

to determine motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

to determine motions to subordinate Claims at any time and on any basis permitted by applicable law;

to determine motions for the rejection or assumption of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any Debtor may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

to hear, determine and resolve all applications, motions, adversary proceedings and contested or litigated matters including, without limitation, those related to all Causes of Action preserved under Section 14.1 of the Plan, whether pending on the Effective Date or commenced thereafter;

to determine or otherwise resolve any and all matters under section 505 of the Bankruptcy Code with respect to any tax, fine, penalty or addition to tax asserted against the Debtors, or their estates;

to consider any Plan modifications, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court;

to determine matters involving the Debtors in connection with actions taken or not taken by the Debtors prior to confirmation of the Plan and matters involving the Debtors or in connection with implementation and effectuation of the Plan, or the Confirmation Order;

to determine all controversies, suits and disputes that may arise in connection with the interpretation, implementation, effectuation or consummation of the Plan or the obligations under the Plan;

to determine such other matters as may be set forth in the Confirmation Order or as may arise in connection with the Plan, or the Confirmation Order;

to hear, determine and resolve any matters or issues arising with respect to or relating to any Orders entered by the Bankruptcy Court in these Chapter 11 Cases;

to determine any and all applications for allowance of Professional Fees and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

to enforce holders' rights to payments and to the delivery of money or other Property to which holders of Allowed Claims may be entitled under the Plan;

to issue injunctions, enter and implement other orders or to take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan, or the Confirmation Order;

to issue orders in aid of execution of the Plan to the extent authorized by Bankruptcy Code section 1142; and

to enter a final decree closing the Chapter 11 Case.

**5.11    Amendment of the Plan**.   At any time before the Confirmation Date, the Debtors, with the consent of the Creditors Committee may alter, amend, or modify the Plan pursuant to Section 1127(a) of the Bankruptcy Code *provided* that such alteration, amendment, or modification does not materially and adversely affect the treatment and rights of the holders of General Unsecured Claims under the Plan.  After the Confirmation Date and before substantial consummation of the Plan as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Plan; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

**5.12    Equity Compensation Plan.**   At, or as soon as practicable after, the Effective Date, the board of directors of Reorganized Debtors shall adopt an equity compensation plan, pursuant to which the Reorganized Debtors shall implement an equity-based program under which participants shall receive either or some combination of restricted stock, restricted stock units, stock options, stock appreciation rights or other types of equity awards.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1    Deemed Assumed**.   Except as otherwise set forth in the Plan, on the Effective Date, all executory contracts or unexpired leases of the Debtor will be deemed assumed in accordance with sections 365 and 1123 of the Bankruptcy Code, except those executory contracts and unexpired leases that (i) have been rejected by order of the Bankruptcy Court, (ii)

are the subject of a motion to reject pending on the Effective Date, (iii) are identified as to be rejected on a list to be filed with the Bankruptcy Court on or before the Confirmation Date, or (iv) are rejected under the Plan. Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Bankruptcy Code sections 365(a) and 1123. The Debtors will file a schedule of assumed agreements twenty-one (21) days before the Confirmation Date with the Bankruptcy Court of executory contracts and unexpired leases to be assumed under the Plan on the Effective Date. That schedule of assumed agreements will list the amount of the proposed cure payment required by 11 U.S.C. § 365(b)(1). The schedule of assumed agreements may be amended at any time up to the Effective Date of the Plan.

Any party that objects to the assumption of its executory contract or unexpired lease by any Debtor or to the proposed cure payment must file with the Court and serve on interested parties a written objection with supporting evidence that states the basis for the objection. This objection must be filed with the Court and served no later than ten (10) days before the Confirmation Hearing. Any entity that fails to timely file and serve an opposition will be deemed to have waived any and all objections to the proposed assumption or the amount of the proposed cure payment. In the absence of a timely objection by such a party, the Confirmation Order shall constitute a final determination of the amount of the cure payment and that the Reorganized Debtor has shown adequate assurances of its future performance.

In the event of a dispute regarding the cure payment, adequate assurances, or some other matter related to assumption, the cure payment required by 11 U.S.C. § 365(b)(1) shall not be made until after an entry of a Final Order resolving the dispute and approving the assumption. Pending the entry of a Final Order, the executory contract or unexpired lease at issue will be deemed assumed by any Reorganized Debtor unless otherwise ordered by the Court. In the absence of a timely filed objection or upon payment of the cure amount required by 11 U.S.C. § 365(b)(1), any prepetition or post petition arrearage or other Claim asserted in a proof of Claim or listed in the Schedules shall be deemed satisfied in full and the Claim shall be deemed disallowed, without further order of the Court or action by any party.

**6.2    Approval of Assumption or Rejection**.  Entry of the Confirmation Order shall constitute:   (i) the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to the Plan or otherwise during the Chapter 11 Case; and (ii) the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan or otherwise during the Chapter 11 Case.

**6.3    Rejection Damage Claim Bar Date**.  Except as otherwise provided in this Section, all Claims arising from rejection shall be filed with the Bankruptcy Court no later than 30 days after the Confirmation Date.  Any Rejection Damage Claim not filed by the deadline shall be forever barred and shall not be entitled to any Distributions under the Plan.

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

A summary description of certain material federal income tax consequences of the Plan is provided below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan and no tax opinion is given by this Disclosure Statement. No rulings or determination letters from the Internal Revenue Service ("IRS") or any other tax authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other tax authorities.

The following discussion of federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.

This discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign entities, nonresident alien individuals, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, broker-dealers, and tax-exempt organizations). Furthermore, estate and gift tax issues are not addressed herein.

**7.1    Federal Tax Consequences to the Holders of Allowed Class 1 and Class 2 Claims**. If a holder of an Allowed Class 1 or Class 2 Claim receives cash in full satisfaction of such Allowed Claim, the holder may be permitted to recognize a loss (or may be required to recognize gain) equal to the difference between (i) the adjusted tax basis such holder had in its Allowed Claim, and (ii) the amount of cash received. Depending upon the manner in which the Allowed Claim arose, such loss (or gain) may either be capital or ordinary in nature. Due to limitations set forth in the Tax Code, a holder of an Allowed Claim that recognizes a capital loss upon the receipt of cash in full satisfaction of such Allowed Claim may not be able to utilize such capital loss in the taxable year it arises or possibly ever.

**7.2    Federal Income Tax Consequences to the Holders of Allowed Class 3 and 4 Claims and Allowed Class 6 Equity Interests**. If a holder of an Allowed Class 3 or 4 Claim or Class 5 Equity Interest receives a distribution in partial or full satisfaction of such Allowed Claim or Equity Interest, the holder may be permitted to recognize a loss (or may be required to recognize gain). Any loss (or gain) will equal the difference between (i) the adjusted tax basis such holder had in the portion of its Claim or Equity Interest that is satisfied by the receipt of the distribution, and (ii) the fair market value of the distribution on the date received. Depending upon the manner in which the Allowed Claim arose, such loss (or gain) may either be capital or ordinary in nature. Due to limitations set forth in the Tax Code, a holder of an Allowed Claim or Equity Interest may not be able to utilize a capital loss in the taxable year it arises or possibly ever. Alternatively, the exchange could also be treated as a tax-free exchange if the Allowed Claim or Equity interest is characterized as a "security" for federal tax purposes. This would prohibit the holder from recognizing any loss (or gain) on the distribution and result in a carryover tax basis and holding period to the holder of the claim.

7.3     **Importance of Obtaining Professional Tax Assistance**.    The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan and Trust and is not a substitute for careful tax planning and analysis with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on the particular circumstances of the Holder of a Claim or Equity Interest. Accordingly, a holder of a Claim and Equity Interest is strongly urged to consult its own tax advisor about the United States federal, state and local and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.

7.4     **Federal Tax Consequences to the Debtors**.    After consultation with their tax advisors, the Debtors have concluded that issuance of new equity interests in MN Holdings to the creditors of both Debtors will result in substantially greater preservation of tax attributes for the benefit of those creditors when compared to reorganization structured as an asset sale or the issuance of new LLC interests in Sun Country.   The Debtors estimate that the value of their business on the Effective Date will be between $10 million and $30 million.   Based on that valuation range, an example of the difference in the preservation of tax attributes depending on the type of reorganization structure is as follows:

| Who issues Stock | LLC Unit/Asset Sale | | Holdings Recapitalization | |
|---|---|---|---|---|
| Equity Value Scenario | $15M | $25M | $15M | $25M |
| Ability to Have Flow-thru Structure | Yes | Yes | No | No |
| Tax Attribute Carryover | No | No | Yes | Yes |
| -Amount: NOLs (after COD) | N/A | N/A | $1.0M | $11.0M |
| -Annual Limitation  on NOL/Credit Use (Sec. 382)* | N/A | N/A | $0.6M | $1.0M |
| * If applicable, see page 6 | | | | |
| Tax Basis in Assets | FMV | FMV | Carryover | Carryover |
| -Amount Gross Assets | $77.3M | $87.3M | $85.2M | $85.2M |
| -Deductible Liabilities:  Aircraft Rents ($6.6M), Other Short Term Accruals ($1.6M), Long Term Return Provisions ($3.6M) | N/A | N/A | $11.8M | $11.8M |

Increased overall tax attributes available in a MN Holdings Recapitalization versus an asset sale would be:

| Holdings Recapitalization  Scenario | $15M | $25M | Reversal Period |
|---|---|---|---|
| Carryover asset basis | $7.9M | ($2.1M) | 15 years |
| NOLs | $1.0M | $11.0M | Worst case: $1M/yr<br>Best Case:  equal to book/taxable income |
| Deductible liabilities | $11.8M | $11.8M | Aircraft Rents & Payroll taxes ($8.2M total) – 1-2 years<br>Long Term Return Provisions ($3.6M) – 5 years |
| Total | $20.7M | $20.7M | |

The ability of the Reorganized Debtors to utilize these tax attributes will be affected by the potential IRC § 382 ownership change resulting under the Plan, or within the 3-year testing period.  If the Petters affiliated entities who hold claims against the Debtors own more than 50% of the New Common Stock under the Plan, there will likely be no limitation on the use of net

operating loss carryforwards immediately after the Effective Date. The resolution of this issue will depend on the outcome of pending objections to the claims held by some of the Petters affiliated entities. A limitation could nevertheless arise if shares of the New Common Stock are subsequently transferred by the Petters receiver. As a result of this transfer, a Section 382 limitation would apply from that point forward on any tax attributes still outstanding. The amount of such limitation would be determined based on the equity value of the company as of the date of the subsequent ownership change (transfer by the Petters receiver). The disclosed Section 382 limitation above in the table reflects the yearly limitation should it apply as of the date of emergence assuming at $15 million to $25 million equity value.

**7.5  IRS CIRCULAR 230 LEGEND**.  TO COMPLY WITH U.S. TREASURY REGULATIONS, WE ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION (1) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY U.S. FEDERAL TAX PENALTIES, AND (2) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION OR MATTER ADDRESSED BY THIS COMMUNICATION.  ANY TAXPAYER RECEIVING THIS COMMUNICATION SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES.


# RISK FACTORS

The restructuring of Debtors involves a degree of risk, and this Disclosure Statement and certain of its Exhibits contain forward-looking statements that involve risks and uncertainty. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSIDER CAREFULLY THE FOLLOWING FACTORS, IN ADDITION TO THE OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BEFORE SUBMITTING A VOTE TO ACCEPT OR REJECT THE PLAN.

**8.1  Reorganization Factors**.  As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. While efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims and Equity Interests should be aware of some of the principal risks associated with the contemplated reorganization:

There is a risk that one of more of the required conditions or obligations under the Plan will not occur, be satisfied or waived, as the case may be, resulting in the inability to confirm the Plan.

The total amount of all Claims filed in the Chapter 11 Case may be materially in excess of the estimated amounts of Allowed Claims assumed in the development of the Plan and in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement. Accordingly, the amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim in any Class may be materially and adversely affected should the estimates be exceeded as to any Class.

**8.2 Certain Bankruptcy-Related Considerations**

**Risk of Non-Confirmation of the Plan**. Although the Debtor believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate the re-solicitation of votes.

**Nonconsensual Confirmation**. If any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such a plan of reorganization at the proponent's request if at least one impaired class has accepted the plan of reorganization (without including the acceptance of any "insider" in such class) and, as to each impaired class that has not accepted the plan of reorganization, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to rejecting impaired classes. If any Impaired Class of Claims or Equity Interests fails to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to request nonconsensual Confirmation of the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

## EXEMPTION FROM SECURITIES ACT REGISTRATION; REGISTRATION RIGHTS

Under the Plan, holders of Allowed Claims in Classes 4A and 4B will receive securities (the New Common Stock) in exchange for its Claims against the Debtor. In many cases, when securities are issued by an entity, they must be registered with the Securities and Exchange Commission and state securities commissions. However, Section 1145 of the Bankruptcy Code creates certain exemptions from the registration and licensing requirements of federal and state securities laws with respect to the issuance and distribution of securities by a debtor under a plan of reorganization to holders of claims or interests wholly or principally in exchange for those claims or interests.

**9.1    Issuance of New Securities Under the Plan**.  In issuing the New Common Stock, MN Holdings will rely on the exemption from the registration requirements of the Securities Act (and the equivalent state statutes commonly referred to as "blue sky" laws) provided by Section 1145(a)(1) of the Bankruptcy Code.  This means that it will not be required to register the securities with any federal or state agencies.

The specific reasons that MN Holdings will not be required to register the securities is that Section 1145(a)(1) of the Bankruptcy Code exempts the issuance of securities from the requirements of the Securities Act of 1933, as amended, and the "blue sky" laws if the following conditions are satisfied:

> the securities are issued by a debtor, an affiliate participating in a joint plan of reorganization with the debtor, or a successor of the debtor under a plan of reorganization;

> the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor; and

> the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for cash or property.

The Debtors believe that the issuance of the New Common Stock in accordance with the Plan will satisfy these requirements and therefore, the issuance of such securities is exempt from the registration requirements of federal and state securities laws.  Therefore, the requirements of the Bankruptcy Code are satisfied, and there is no need to register the securities.


## ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION

If the Plan is not timely confirmed, an alternative is a Chapter 7 liquidation proceeding. In a Chapter 7 liquidation proceeding, a liquidation trustee would be appointed to oversee the liquidation of the Debtor's assets.  Such trustee would be entitled to retain a new set of professionals, including lawyers and accountants, to review and analyze all of the Claims and the Debtors' assets.  In addition, the liquidation trustee would be entitled to request a fee equal to 3% of all distributions made to the Creditors.  The Debtors believe that the conversion to a Chapter 7 liquidation proceeding and the appointment of a new trustee and new estate professionals would increase professional fees and result in further delays and a reduction in distributions to the Creditors.

The Debtors could continue in Chapter 11 proceedings while the Debtors' assets are being liquidated and distributed.  In a Chapter 11 proceeding, the Debtors' assets would be sold subject to higher and better bids under Bankruptcy Court supervision.  However, the professionals would continue to be retained and their services would be necessary in preparing the motions and applications and advising the Debtors and the Committee.  In addition, every action of the

Debtors would be subject to the same level of scrutiny and the objections of the various parties in interest. Obviously, this would further delay the receipt of any distributions by the Creditors since the Bankruptcy Court's approval would need to be obtained prior to the sale of any assets, and the professional fees incurred in the Chapter 11 proceeding would drain the Debtors of the cash that would otherwise be paid to the Creditors.

In addition, another alternative plan could be pursued by another party-in-interest to the extent that it is allowed by the Bankruptcy Court and the Bankruptcy Code. These plans could be pursued with permission of the Bankruptcy Court or after the Debtor has failed to gain acceptance of the Plan. Pursuit of multiple plans would be expensive, since the professionals would need to evaluate the competing plans and file objections to the plans. This would incur a substantial amount of professional fees which would ultimately reduce the funds available to repay the Creditors of their Debtors.

The Debtors and its professional advisors have explored various alternative scenarios, including the scenarios described above, and believe that the Plan enables the holders of Claims to realize the maximum recovery under the circumstances. The Debtors believe that the Plan is the best plan that can be proposed and served the best interests of the Debtor and other parties in interest.

Attached to this Disclosure Statement as **Exhibit 4** is a liquidation analysis prepared by the Debtor with the assistance of, and in consultation with, its financial and legal advisors. The estimated recoveries set forth on **Exhibit 4** are based upon, among other things, the Debtors' best estimate of the amount of Allowed Claims in the event of a Chapter 7 case.


## RECOMMENDATION AND CONCLUSION

The Debtors, the Committee and its respective professional advisors have analyzed different scenarios and believe that the Plan will provide for a larger distribution to holders of Claims than would otherwise result if an alternative restructuring plan were proposed or the Debtor's assets were liquidated. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller distributions to the holders of Claims. Accordingly, the Debtor and the Committee recommend confirmation of the Plan and urge all holders of Impaired Claims and to vote to accept the Plan and to indicate acceptance by returning its Ballots so as to be received by no later than the Voting Deadline.

Dated:  April 5, 2010          Respectfully submitted,

                               RAVICH MEYER KIRKMAN McGRATH
                               NAUMAN & TANSEY,
                               A PROFESSIONAL ASSOCIATION

By    /e    Michael L. Meyer (72527)
               Will R. Tansey (0323056)

4545 IDS Center, 80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-8511

ATTORNEYS FOR DEBTOR

Dated:  April 5, 2010

MN AIRLINES, LLC

By_____
    Stanley J. Gadek
    Chief Executive Officer

MN AIRLINE HOLDINGS, INC.

By_____
    Stanley J. Gadek
    Chief Executive Officer

# EXHIBIT 2

MN Airlines LLC
Balance Sheet
At December 31, 2007
(Internal and Unaudited)

## ASSETS

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 8,808,182 |
| Restricted escrow cash | | 1,948,559 |
| Short-term investments | | 1,386,962 |
| Accounts receivables | | 29,342,348 |
| Short-term lessor reserves | | 4,856,652 |
| Prepaid expenses and other | | 3,022,395 |
| **Total Current Assets** | | **49,365,098** |
| | | |
| Rotable inventory | | 1,250,616 |
| Office and ground equipment | | 3,911,099 |
| Capitalized leased assets | | 10,206,075 |
| Leasehold improvements aircraft and other | | 6,352,159 |
| **Total Fixed Assets** | | **21,719,949** |
| Less accumulated depreciation | | 2,414,858 |
| **Property and equipment--net** | | **19,305,091** |
| | | |
| Aircraft lease deposits | | 10,488,709 |
| Long-term lessor reserves receivables | | 13,236,251 |
| Other assets | | 930,101 |
| Goodwill | | 5,010,320 |
| Other intangibles | | 28,503,607 |
| **Total Other Assets** | | **58,168,988** |
| | | |
| **Total Assets** | **$** | **126,839,177** |

## LIABILITIES AND MEMBER'S EQUITY

| | | |
|---|---|---:|
| Unearned revenue | $ | 36,988,535 |
| Notes payable | | 6,943,397 |
| Accounts payable | | 12,668,987 |
| Accrued leases and rents | | 395,195 |
| Accrued vacation and payroll | | 3,842,858 |
| Other accrued liabilities | | 3,146,260 |
| Transportation taxes | | 4,930,258 |
| **Total Current Liabilities** | | **68,915,490** |
| | | |
| Capital lease obligations | | 10,905,745 |
| Long-term other | | 4,908,653 |
| Long-term debt | | 33,212,588 |
| **Total Long Term Liabilities** | | **49,026,986** |
| | | |
| **Total Liabilities** | | **117,942,476** |
| | | |
| Member's equity | | 27,000,001 |
| Accumulated deficit | | (18,103,300) |
| **Total Member's Equity** | | **8,896,701** |
| | | |
| **Total Liabilities & Member's Equity** | **$** | **126,839,177** |

MN Airlines LLC
Statement of Operations
For the Year Ended December 31, 2007
(Internal and Unaudited)

**Revenue:**

| | |
|---|---:|
| Passenger revenue | $ 226,729,906 |
| Other revenue | 8,459,964 |
| **Total Revenue** | **235,189,870** |

**Expenses:**

| | |
|---|---:|
| Salaries, wages and benefits | 47,674,384 |
| Aircraft fuel | 83,303,195 |
| Maintenance, materials and repairs | 12,422,615 |
| Marketing, advertising and sales distribution | 17,753,415 |
| Aircraft rent | 43,375,778 |
| Depreciation and amortization | 6,074,403 |
| Impairment | 2,409,912 |
| Other | 50,034,968 |
| **Total Operating Expenses** | **263,048,670** |
| | |
| **Operating Loss** | **(27,858,800)** |
| | |
| Interest income | 1,415,419 |
| Interest expense | (3,606,042) |
| Other | 121,240 |
| **Other Income (Expense)** | **(2,069,383)** |
| | |
| **Net Loss** | **$ (29,928,183)** |

MN Airlines LLC
Statement of Cash Flows
For the Year Ended December 31, 2007
(Internal and Unaudited)

| | |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Net loss | $ (29,928,183) |
| Adjustments to reconcile net loss to net cash from operating activities: | |
| Depreciation and amortization | 6,074,403 |
| Impairment of intangibles | 2,409,912 |
| Gain on sale of investments | (3,568,761) |
| Changes in operating assets and liabilities | |
| Restricted cash and investments | 2,589,016 |
| Accounts receivable | 1,530,650 |
| Prepaid expenses and other | (3,046,765) |
| Aircraft lease and other deposits | (2,135,200) |
| Accounts payable | (72,352) |
| Air traffic liability | 2,436,106 |
| Other liabilities | 2,782,590 |
| **Net cash used in operating activities** | **(20,928,584)** |
| | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | |
| Purchases of property and equipment | (7,061,744) |
| Purchase of investments | (11,771,140) |
| Proceeds from the sale of investments | 18,205,413 |
| **Net cash used in investing activities** | **(627,471)** |
| | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | |
| Proceeds from borrowing and capital leases | 46,892,453 |
| Repayment of borrowings | (18,574,129) |
| **Net cash provided by financing activities** | **28,318,324** |
| | |
| NET INCREASE IN CASH AND EQUIVALENTS | 6,762,269 |
| | |
| CASH AND EQUIVALENTS — Beginning of year | 2,045,913 |
| | |
| **CASH AND EQUIVALENTS — End of year** | **$    8,808,182** |

MN Airlines LLC
Balance Sheet
At December 31, 2008
(Internal and Unaudited)

## ASSETS

| | |
|---|---:|
| Cash and cash equivalents | $ 11,989,961 |
| Restricted escrow cash | 289,040 |
| Short-term investments | 994,221 |
| Accounts receivables | 29,337,715 |
| Short-term lessor reserves | 4,254,744 |
| Prepaid expenses and other | 3,362,741 |
| **Total Current Assets** | **50,228,422** |
| | |
| Rotable inventory | 1,560,445 |
| Office and ground equipment | 4,255,080 |
| Capitalized leased assets | 10,206,075 |
| Leasehold improvements aircraft and other | 14,684,682 |
| **Total Fixed Assets** | **30,706,282** |
| Less accumulated depreciation | 6,130,758 |
| **Property and equipment--net** | **24,575,524** |
| | |
| Aircraft lease deposits | 8,811,709 |
| Long-term lessor reserves receivables | 9,875,576 |
| Other assets | 832,396 |
| Goodwill | 5,010,320 |
| Other intangibles | 14,602,503 |
| **Total Other Assets** | **39,132,504** |
| | |
| **Total Assets** | **$ 113,936,450** |

## LIABILITIES AND MEMBER'S DEFICIT

| | |
|---|---:|
| Unearned revenue | $ 22,956,220 |
| Notes payable | 57,905,985 |
| Accounts payable | 18,825,199 |
| Accrued leases and rents | 5,399,714 |
| Accrued vacation and payroll | 4,287,569 |
| Other accrued liabilities | 6,191,171 |
| Transportation taxes | 4,717,802 |
| **Total Current Liabilities** | **120,283,660** |
| | |
| Capital lease obligations | 10,785,153 |
| Long-term other | 4,043,678 |
| Long-term debt | - |
| **Total Long Term Liabilities** | **14,828,831** |
| | |
| **Total Liabilities** | **135,112,491** |
| | |
| Member's equity | 27,000,001 |
| Accumulated deficit | (48,176,042) |
| **Total Member's Deficit** | **(21,176,041)** |
| | |
| **Total Liabilities & Member's Deficit** | **$ 113,936,450** |

MN Airlines LLC
Statement of Operations
For the Year Ended December 31, 2008
(Internal and Unaudited)

**Revenue:**

| | |
|---|---:|
| Passenger revenue | $ 244,705,477 |
| Other revenue | 19,318,072 |
| **Total Revenue** | **264,023,549** |

**Expenses:**

| | |
|---|---:|
| Salaries, wages and benefits | 40,806,538 |
| Aircraft fuel | 104,208,138 |
| Maintenance, materials and repairs | 15,669,440 |
| Marketing, advertising and sales distribution | 13,068,452 |
| Aircraft rent | 47,850,774 |
| Depreciation and amortization | 7,593,649 |
| Impairment | 10,055,548 |
| Other | 46,583,962 |
| **Total Operating Expenses** | **285,836,501** |
| **Operating Loss** | **(21,812,952)** |
| Interest income | 447,258 |
| Interest expense | (4,859,757) |
| Other | (3,847,291) |
| **Other Income (Expense)** | **(8,259,790)** |
| **Net Loss** | **$ (30,072,742)** |

MN Airlines LLC
Statement of Cash Flows
For the Year Ended December 31, 2008
(Internal and Unaudited)

| | |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Net loss | $ (30,072,742) |
| Adjustments to reconcile net loss to net cash from operating activities: | |
| Depreciation and amortization | 7,593,649 |
| Impairment of intangibles | 10,055,548 |
| Reorganization expenses | 1,735,921 |
| Changes in operating assets and liabilities | |
| Restricted cash and investments | 2,052,260 |
| Accounts receivable | 4,633 |
| Prepaid expenses and other | 3,677,641 |
| Aircraft lease and other deposits | 1,677,000 |
| Accounts payable | 3,140,100 |
| Air traffic liability | (14,032,314) |
| Other liabilities | 8,746,898 |
| **Net cash used in operating activities** | **(5,421,406)** |
| | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | |
| Purchases of property and equipment | (8,976,223) |
| **Net cash used in investing activities** | **(8,976,223)** |
| | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | |
| Proceeds from debtor-in possession loan (post-petition) | 1,000,000 |
| Proceeds from borrowing and capital leases | 18,700,000 |
| Repayment of borrowings | (2,120,592) |
| **Net cash provided by financing activities** | **17,579,408** |
| | |
| NET INCREASE IN CASH AND EQUIVALENTS | 3,181,779 |
| CASH AND EQUIVALENTS — Beginning of year | 8,808,182 |
| **CASH AND EQUIVALENTS — End of year** | **$ 11,989,961** |

MN Airlines LLC
Balance Sheet
At December 31, 2009
(Internal and Unaudited)

## ASSETS

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 9,319,982 |
| Restricted escrow cash | | 2,221,531 |
| Short-term investments | | 1,087,504 |
| Accounts receivables | | 28,206,925 |
| Short-term lessor reserves | | 797,307 |
| Prepaid expenses and other | | 3,935,130 |
| **Total Current Assets** | | **45,568,379** |
| | | |
| Rotable inventory | | 1,719,591 |
| Office and ground equipment | | 4,505,978 |
| Capitalized leased assets | | 10,206,075 |
| Leasehold improvements aircraft and other | | 21,718,768 |
| Total Fixed Assets | | **38,150,412** |
| Less accumulated depreciation | | 12,945,861 |
| **Property and equipment--net** | | **25,204,551** |
| | | |
| Aircraft lease deposits | | 9,249,100 |
| Long-term lessor reserves receivables | | 14,758,921 |
| Other assets | | 905,684 |
| Goodwill | | 5,010,320 |
| Other intangibles | | 13,340,281 |
| **Total Other Assets** | | **43,264,306** |
| | | |
| **Total Assets** | **$** | **114,037,236** |

## LIABILITIES AND MEMBER'S DEFICIT

| | | |
|---|---|---:|
| Unearned revenue | $ | 25,772,293 |
| Notes payable | | 56,905,984 |
| Accounts payable | | 14,478,387 |
| Accrued leases and rents | | 6,674,861 |
| Accrued vacation and payroll | | 3,584,068 |
| Other accrued liabilities | | 6,225,810 |
| Transportation taxes | | 5,939,686 |
| **Total Current Liabilities** | | **119,581,089** |
| | | |
| Capital lease obligations | | 10,652,492 |
| Long-term other | | 3,569,748 |
| Long-term debt | | - |
| **Total Long Term Liabilities** | | **14,222,241** |
| | | |
| **Total Liabilities** | | **133,803,330** |
| | | |
| Member's equity | | 27,000,001 |
| Accumulated deficit | | (46,766,095) |
| **Total Member's Deficit** | | **(19,766,094)** |
| | | |
| **Total Liabilities & Member's Deficit** | **$** | **114,037,236** |

MN Airlines LLC
Statement of Operations
For the Year Ended December 31, 2009
(Internal and Unaudited)

| | | |
|---|---|---:|
| **Revenue:** | | |
| Passenger revenue | $ | 177,244,823 |
| Other revenue | | 24,980,653 |
| **Total Revenue** | | **202,225,476** |
| | | |
| **Expenses:** | | |
| Salaries, wages and benefits | | 38,804,346 |
| Aircraft fuel | | 48,145,036 |
| Maintenance, materials and repairs | | 11,665,054 |
| Marketing, advertising and sales distribution | | 11,883,114 |
| Aircraft rent | | 37,610,308 |
| Depreciation and amortization | | 8,158,874 |
| Other | | 40,426,540 |
| **Total Operating Expenses** | | **196,693,271** |
| | | |
| **Operating Profit** | | 5,532,205 |
| | | |
| Interest income | | 280,173 |
| Interest expense | | (1,191,255) |
| Other | | (3,211,175) |
| **Other Income (Expense)** | | (4,122,258) |
| | | |
| **Net Income** | $ | **1,409,947** |

MN Airlines LLC
Statement of Cash Flows
For the Year Ended December 31, 2009
(Internal and Unaudited)

| | |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Net income | $ 1,409,947 |
| Adjustments to reconcile net income to net cash from operating activities: | |
| Depreciation and amortization | 8,158,874 |
| Changes in operating assets and liabilities | |
| Restricted cash and investments | (2,025,774) |
| Accounts receivable | 1,130,790 |
| Prepaid expenses and other | (2,151,912) |
| Aircraft lease and other deposits | (437,391) |
| Accounts payable | (5,000,053) |
| Air traffic liability | 2,058,782 |
| Other liabilities | 2,763,550 |
| **Net cash provided by operating activities** | **5,906,813** |
| | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | |
| Purchases of property and equipment | (7,444,131) |
| **Net cash used in investing activities** | **(7,444,131)** |
| | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | |
| Repayment of borrowings | (1,132,661) |
| **Net cash used in financing activities** | **(1,132,661)** |
| | |
| NET DECREASE IN CASH AND EQUIVALENTS | (2,669,979) |
| | |
| CASH AND EQUIVALENTS — Beginning of year | 11,989,961 |
| | |
| **CASH AND EQUIVALENTS — End of year** | **$ 9,319,982** |

MN Airlines LLC
Balance Sheet
At February 28, 2010
(Internal and Unaudited)

## ASSETS

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 10,377,883 |
| Restricted escrow cash | | 717,595 |
| Short-term investments | | 1,174,983 |
| Accounts receivables | | 33,503,925 |
| Short-term lessor reserves | | 781,108 |
| Prepaid expenses and other | | 3,941,077 |
| **Total Current Assets** | | **50,496,571** |
| | | |
| Rotable inventory | | 1,719,591 |
| Office and ground equipment | | 4,505,978 |
| Capitalized leased assets | | 10,206,075 |
| Leasehold improvements aircraft and other | | 21,746,124 |
| Total Fixed Assets | | **38,177,768** |
| Less accumulated depreciation | | 14,061,582 |
| **Property and equipment--net** | | **24,116,186** |
| | | |
| Aircraft lease deposits | | 9,325,100 |
| Long-term lessor reserves receivables | | 15,392,121 |
| Other assets | | 1,434,918 |
| Goodwill | | 5,010,320 |
| Other intangibles | | 13,129,911 |
| **Total Other Assets** | | **44,292,370** |
| | | |
| **Total Assets** | **$** | **118,905,127** |

## LIABILITIES AND MEMBER'S DEFICIT

| | | |
|---|---|---:|
| Unearned revenue | $ | 27,884,945 |
| Notes payable | | 56,905,985 |
| Accounts payable | | 14,215,542 |
| Accrued leases and rents | | 6,680,650 |
| Accrued vacation and payroll | | 4,407,049 |
| Other accrued liabilities | | 5,828,905 |
| Transportation taxes | | 6,893,339 |
| **Total Current Liabilities** | | **122,816,415** |
| | | |
| Capital lease obligations | | 10,651,767 |
| Long-term other | | 3,269,109 |
| Long-term debt | | - |
| **Total Long Term Liabilities** | | **13,920,876** |
| | | |
| **Total Liabilities** | | **136,737,291** |
| | | |
| Member's equity | | 27,000,001 |
| Accumulated deficit | | (44,832,165) |
| **Total Member's Deficit** | | **(17,832,164)** |
| | | |
| **Total Liabilities & Member's Deficit** | **$** | **118,905,127** |

MN Airlines LLC
Statement of Operations
For the Two Months Ended February 28, 2010
(Internal and Unaudited)

| | | |
|---|---|---:|
| **Revenue:** | | |
| Passenger revenue | $ | 39,206,473 |
| Other revenue | | 525,108 |
| **Total Revenue** | | **39,731,581** |
| | | |
| **Expenses:** | | |
| Salaries, wages and benefits | | 7,194,077 |
| Aircraft fuel | | 11,129,684 |
| Maintenance, materials and repairs | | 1,639,656 |
| Marketing, advertising and sales distribution | | 1,956,765 |
| Aircraft rent | | 6,408,278 |
| Depreciation and amortization | | 1,333,692 |
| Other | | 7,590,830 |
| **Total Operating Expenses** | | **37,252,982** |
| | | |
| **Operating Income** | | 2,478,599 |
| | | |
| Interest income/expense-net | | (180,097) |
| Other | | (364,572) |
| **Other Income (Expense)** | | **(544,669)** |
| | | |
| **Net Income** | $ | **1,933,930** |

MN Airlines LLC
Statement of Cash Flows
For the Two Months Ended February 28, 2010
(Internal and Unaudited)

| | | |
|---|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net income | $ | 1,933,930 |
| Adjustments to reconcile net income to net cash from operating activities: | | |
| Depreciation and amortization | | 1,333,692 |
| Changes in operating assets and liabilities | | |
| Restricted cash and investments | | 1,416,457 |
| Accounts receivable | | (5,297,000) |
| Prepaid expenses and other | | (1,159,783) |
| Aircraft lease and other deposits | | (76,000) |
| Accounts payable | | (262,570) |
| Air traffic liability | | 2,112,652 |
| Other liabilities | | 1,083,879 |
| **Net cash provided by operating activities** | | **1,085,257** |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of property and equipment | | (27,356) |
| **Net cash used in investing activities** | | **(27,356)** |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds from borrowing and capital leases | | - |
| Repayment of borrowings | | - |
| **Net cash provided by financing activities** | | - |
| NET INCREASE IN CASH AND EQUIVALENTS | | 1,057,901 |
| CASH AND EQUIVALENTS — Beginning of year | | 9,319,982 |
| **CASH AND EQUIVALENTS — At February 28, 2010** | $ | 10,377,883 |

MN Airline Holdings, Inc.
Balance Sheet
At December 31, 2007
(Internal and Unaudited)

## ASSETS

| | | |
|---|---|---:|
| Cash | $ | 51,239 |
| Notes receivable | | 7,586,067 |
| **Total Current Assets** | | **7,637,306** |
| | | |
| Investments | | 27,000,000 |
| Goodwill | | 264,404 |
| **Total Other Assets** | | **27,264,404** |
| | | |
| **Total Assets** | **$** | **34,901,710** |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---:|
| Accounts payables | $ | 139 |
| Accrued interest | | 1,050,411 |
| Taxes payable | | 20,720 |
| **Total Current Liabilities** | | **1,071,270** |
| | | |
| Deferred tax liability | | 106,763 |
| Accrued dividends | | 763,636 |
| Long term debt | | 8,181,818 |
| **Total Long Term Liabilities** | | **9,052,217** |
| | | |
| **Total Liabilities** | | **10,123,487** |
| | | |
| Common stock | | 17,958,350 |
| Preferred stock | | 8,181,818 |
| Dividends | | (763,636) |
| Accumulated deficit | | (598,309) |
| **Total Stockholders' Equity** | | **24,778,222** |
| | | |
| **Total Liabilities & Stockholders' Equity** | **$** | **34,901,710** |

MN Airline Holdings, Inc.
Statement of Operations
For the Year Ended December 31, 2007
(Internal and Unaudited)

| | | |
|---|---|---:|
| **Expenses:** | | |
| Other | $ | 139 |
| **Total Operating Expenses** | | 139 |
| | | |
| **Operating Profit** | | (139) |
| | | |
| Interest income | | 315,320 |
| Interest expense | | (900,000) |
| **Other Income (Expense)** | | **(584,680)** |
| | | |
| Tax benefit | | (136,921) |
| | | |
| **Net Loss** | $ | **(447,759)** |

MN Airline Holdings, Inc.
Balance Sheet
At December 31, 2008
(Internal and Unaudited)

## ASSETS

| | | |
|---|---|---:|
| Cash | $ | 1,951 |
| Notes receivable | | 7,975,833 |
| **Total Current Assets** | | **7,977,784** |
| | | |
| Investments | | 27,000,000 |
| Goodwill | | 264,404 |
| **Total Other Assets** | | **27,264,404** |
| | | |
| **Total Assets** | **$** | **35,242,188** |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---:|
| Accounts payables | $ | 325 |
| Accrued interest | | 1,738,356 |
| Taxes payable | | 31,080 |
| **Total Current Liabilities** | | **1,769,761** |
| | | |
| Deferred tax liability | | 150,955 |
| Accrued dividends | | 1,418,182 |
| Long term debt | | 8,181,818 |
| **Total Long Term Liabilities** | | **9,750,955** |
| | | |
| **Total Liabilities** | | **11,520,716** |
| | | |
| Common stock | | 17,958,350 |
| Preferred stock | | 8,181,818 |
| Dividends | | (1,418,181) |
| Accumulated deficit | | (1,000,515) |
| **Total Stockholders' Equity** | | **23,721,472** |
| | | |
| **Total Liabilities & Stockholders' Equity** | **$** | **35,242,188** |

MN Airline Holdings, Inc.
Statement of Operations
For the Year Ended December 31, 2008
(Internal and Unaudited)

| | | |
|---|---:|---|
| **Expenses:** | | |
| Other | $ | - |
| **Total Operating Expenses** | | - |
| | | |
| **Operating Profit** | | - |
| | | |
| Interest income | | 340,617 |
| Interest expense | | (687,946) |
| Other | | (325) |
| **Other Income (Expense)** | | **(347,654)** |
| | | |
| Tax expense | | 54,552 |
| | | |
| **Net Loss** | $ | **(402,206)** |

MN Airline Holdings, Inc.
Balance Sheet
At December 31, 2009
(Internal and Unaudited)

**ASSETS**

| | | |
|---|---|---:|
| Cash | $ | 1,843 |
| Notes receivable | | 7,975,833 |
| **Total Current Assets** | | **7,977,676** |
| | | |
| Investments | | 27,000,000 |
| Goodwill | | 264,404 |
| **Total Other Assets** | | **27,264,404** |
| | | |
| **Total Assets** | **$** | **35,242,080** |

**LIABILITIES AND STOCKHOLDERS' EQUITY**

| | | |
|---|---|---:|
| Accounts payables | $ | 1,625 |
| Accrued interest | | 1,738,356 |
| Taxes payable | | 31,080 |
| **Total Current Liabilities** | | **1,771,061** |
| | | |
| Deferred tax liability | | 150,955 |
| Accrued dividends | | 2,072,727 |
| Long term debt | | 8,181,818 |
| **Total Long Term Liabilities** | | **10,405,500** |
| | | |
| **Total Liabilities** | | **12,176,561** |
| | | |
| Common stock | | 17,958,350 |
| Preferred stock | | 8,181,818 |
| Dividends | | (2,072,727) |
| Accumulated deficit | | (1,001,922) |
| **Total Stockholders' Equity** | | **23,065,519** |
| | | |
| **Total Liabilities & Stockholders' Equity** | **$** | **35,242,080** |

MN Airline Holdings, Inc.
Statement of Operations
For the Year Ended December 31, 2009
(Internal and Unaudited)

| | | |
|---|---|---:|
| **Expenses:** | | |
| Other | $ | - |
| **Total Operating Expenses** | | - |
| | | |
| **Operating Profit** | | - |
| | | |
| Interest income | | 2 |
| Interest expense | | - |
| Other | | (1,409) |
| **Other Income (Expense)** | | **(1,407)** |
| | | |
| Tax expense | | - |
| | | |
| **Net Loss** | $ | **(1,407)** |

MN Airline Holdings, Inc.
Balance Sheet
At February 28, 2010
(Internal and Unaudited)

## ASSETS

| | | |
|---|---|---:|
| Cash | $ | - |
| Accounts receivable | | 218 |
| Notes receivable | | 7,975,833 |
| **Total Current Assets** | | **7,976,051** |
| | | |
| Investments | | 27,000,000 |
| Goodwill | | 264,404 |
| **Total Other Assets** | | **27,264,404** |
| | | |
| **Total Assets** | $ | **35,240,455** |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---:|
| Accounts payables | $ | - |
| Accrued interest | | 1,738,356 |
| Taxes payable | | 31,080 |
| **Total Current Liabilities** | | **1,769,436** |
| | | |
| Deferred tax liability | | 150,955 |
| Accrued dividends | | 2,332,771 |
| Long term debt | | 8,181,818 |
| **Total Long Term Liabilities** | | **10,665,544** |
| | | |
| **Total Liabilities** | | **12,434,980** |
| | | |
| Common stock | | 17,958,350 |
| Preferred stock | | 8,181,818 |
| Dividends | | (2,332,771) |
| Accumulated deficit | | (1,001,922) |
| **Total Stockholders' Equity** | | **22,805,475** |
| | | |
| **Total Liabilities & Stockholders' Equity** | $ | **35,240,455** |

MN Airline Holdings, Inc.
Statement of Operations
For the Two Months Ended February 28, 2010
(Internal and Unaudited)

| | | |
|---|---|---|
| **Expenses:** | | |
| Other | $ | - |
| **Total Operating Expenses** | | - |
| | | |
| **Operating Profit** | | - |
| | | |
| Interest income | | - |
| Interest expense | | - |
| Other | | - |
| **Other Income (Expense)** | | - |
| | | |
| Tax expense | | - |
| | | |
| **Net Loss** | $ | - |

# EXHIBIT 3

| ($000) | Jan | Feb | Mar | Q1 | Apr | May | Jun | Q2 | Jul | Aug | Sep | Q3 | Oct | Nov | Dec | Q4 | FY10 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues ($000)** | | | | | | | | | | | | | | | | | |
| Scheduled | 13,443 | 16,575 | 22,527 | 52,545 | 10,044 | 7,322 | 11,921 | 29,287 | 15,884 | 14,504 | 7,840 | 38,229 | 8,403 | 10,162 | 12,292 | 30,857 | 150,918 |
| Charter | 2,582 | 2,349 | 2,500 | 7,431 | 3,122 | 3,122 | 2,974 | 9,218 | 2,359 | 2,859 | 2,154 | 7,373 | 3,841 | 3,441 | 2,603 | 9,886 | 33,907 |
| ACMI | | | | | 750 | 750 | 750 | 2,250 | 750 | 750 | 450 | 1,950 | 850 | 750 | 750 | 2,350 | 6,550 |
| Ancillary | 1,701 | 1,961 | 2,446 | 6,108 | 1,199 | 1,104 | 1,780 | 4,082 | 2,273 | 2,060 | 1,233 | 5,555 | 1,299 | 1,450 | 1,881 | 4,630 | 20,376 |
| Cargo | | | | | | | | | | | | | | | | | 92 |
| Mail | | | | 63 | | | | 127 | | | | 303 | | | | 257 | 750 |
| Station/Deicing | | | | 102 | | | | | | | | | | | | | 231 |
| SCV Land | | | | 434 | | | | | | | | | | | | | 1,504 |
| VIP Membership | 25 | 25 | 25 | 75 | 25 | 25 | 25 | 75 | 25 | 25 | 25 | 75 | 25 | 25 | 25 | 75 | 300 |
| Other | 36 | 36 | 36 | 108 | 36 | 36 | 36 | 108 | 36 | 36 | 36 | 108 | 36 | 36 | 36 | 108 | 431 |
| **Total Revenue** | 17,858 | 21,136 | 27,871 | 66,865 | 15,334 | 12,469 | 17,685 | 45,476 | 21,589 | 20,492 | 11,951 | 54,032 | 14,707 | 16,110 | 17,867 | 48,684 | 215,059 |
| | | | | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | | | | |
| Salaries, wages & benefits | 3,365 | 3,516 | 3,606 | 10,487 | 3,325 | 3,184 | 3,255 | 9,764 | 3,398 | 3,309 | 3,078 | 9,784 | 3,215 | 3,165 | 3,205 | 9,584 | 39,620 |
| Profit Sharing | (49) | 180 | 552 | 683 | (74) | (240) | (79) | (401) | 327 | 285 | (392) | 220 | (65) | 36 | 20 | (9) | 493 |
| SCV Land | 115 | 115 | 286 | 462 | 81 | 58 | 76 | 214 | 101 | 100 | 76 | 277 | 118 | 118 | 158 | 397 | 1,350 |
| Aircraft Fuel | 5,404 | 5,592 | 7,047 | 18,433 | 4,346 | 3,757 | 4,936 | 13,039 | 5,831 | 5,541 | 3,704 | 15,075 | 4,116 | 4,384 | 4,841 | 13,341 | 59,888 |
| MX, materials & repairs | 793 | 939 | 946 | 2,678 | 874 | 710 | 879 | 2,463 | 931 | 869 | 693 | 2,492 | 770 | 783 | 800 | 2,353 | 9,986 |
| Travel agent commissions | 132 | 130 | 151 | 413 | 74 | 84 | 143 | 301 | 124 | 92 | 168 | 384 | 87 | 91 | 100 | 278 | 1,376 |
| credit card fees | 402 | 312 | 286 | 1,000 | 248 | 273 | 412 | 933 | 379 | 370 | 340 | 1,089 | 349 | 341 | 343 | 1,034 | 4,056 |
| Booking fees | 319 | 285 | 246 | 851 | 217 | 238 | 288 | 742 | 297 | 302 | 257 | 857 | 254 | 237 | 219 | 710 | 3,159 |
| Aircraft rent | 3,226 | 3,263 | 3,314 | 9,803 | 2,739 | 2,562 | 2,573 | 7,874 | 2,580 | 2,577 | 2,558 | 7,715 | 2,565 | 2,566 | 2,572 | 7,703 | 33,094 |
| Landing fees & other rent | 439 | 489 | 449 | 1,377 | 390 | 405 | 502 | 1,297 | 559 | 525 | 418 | 1,502 | 415 | 430 | 448 | 1,294 | 5,469 |
| Marketing & advertising | 289 | 234 | 91 | 614 | 193 | 228 | 207 | 629 | 177 | 243 | 186 | 607 | 182 | 166 | 234 | 582 | 2,432 |
| AC insurance & security | 216 | 238 | 270 | 724 | 189 | 166 | 203 | 558 | 231 | 222 | 167 | 620 | 180 | 186 | 199 | 565 | 2,467 |
| Depr & amortization | 670 | 670 | 670 | 2,009 | 669 | 669 | 667 | 2,005 | 663 | 663 | 680 | 2,006 | 698 | 713 | 709 | 2,120 | 8,140 |
| Other & Contingency | 2,713 | 2,884 | 4,634 | 10,231 | 2,468 | 2,284 | 4,016 | 8,709 | 2,933 | 2,725 | 3,554 | 9,212 | 2,331 | 2,398 | 3,814 | 8,544 | 36,696 |
| **Total Expenses** | 17,979 | 19,198 | 22,587 | 59,764 | 15,681 | 14,370 | 18,076 | 48,126 | 18,577 | 17,855 | 15,408 | 51,840 | 15,218 | 15,715 | 17,613 | 48,546 | 208,276 |
| | | | | | | | | | | | | | | | | | |
| Oper. Income/(Loss) | (122) | 1,939 | 5,284 | 7,101 | (347) | (1,910) | (392) | (2,649) | 3,012 | 2,637 | (3,457) | 2,192 | (511) | 394 | 254 | 138 | 6,783 |
| | | | | | | | | | | | | | | | | | |
| Other Income/(Exp) | (321) | (315) | (320) | (956) | (322) | (321) | (321) | (964) | (64) | (71) | (72) | (208) | (72) | (73) | (73) | (218) | (2,346) |
| | | | | | | | | | | | | | | | | | |
| Net Incr/(Loss) B4 Tax | (443) | 1,624 | 4,965 | 6,146 | (669) | (2,231) | (713) | (3,613) | 2,947 | 2,566 | (3,529) | 1,984 | (583) | 322 | 181 | (80) | 4,437 |
| est 0% tax rate | | | | | | | | | | | | | | | | | |
| **Net Incr/(Loss)** | (443) | 1,624 | 4,965 | 6,146 | (669) | (2,231) | (713) | (3,613) | 2,947 | 2,566 | (3,529) | 1,984 | (583) | 322 | 181 | (80) | 4,437 |
| | | | | | | | | | | | | | | | | | |
| **EBITDA** | 548 | 2,608 | 5,954 | 9,110 | 322 | (1,241) | 275 | (644) | 3,679 | 3,300 | (2,781) | 4,198 | 187 | 1,108 | 964 | 2,258 | 14,923 |
| Operating Margin | -0.68% | 9.17% | 18.96% | 10.62% | -2.26% | -15.33% | -2.22% | -5.82% | 13.95% | 12.87% | -28.92% | 4.06% | -3.47% | 2.45% | 1.42% | 0.28% | 3.15% |

## Statistics

| | Jan | Feb | Mar | Q1 | ... | FY10 Total |
|---|---|---|---|---|---|---|
| Fuel-Gallons (less ACMI) | 2,287,226 | 2,539,378 | 2,918,384 | 7,744,988 | | 24,796,915 |
| Fuel Burn | 743 | 784 | 739 | | | 939 |
| Fuel-Cost/Blk Hr (less ACMI) | 1,755.61 | 1,777.17 | 1,832.47 | 1,791.39 | | 1,785.80 |
| Fuel-Price / Gallon | 2.36 | 2.36 | 2.41 | 2.38 | | 2.42 |
| Crude Oil - $/Barrel | 80.13 | 80.00 | 81.71 | 85.00 | | 84.18 |
| Crack Spread - $/Barrel | 7.92 | 7.75 | 6.89 | 5.00 | | 5.47 |
| Block Hours (Total less ACMI) | 3,078 | 3,366 | 3,846 | 10,290 | | 33,536 |
| Block Hours (Total less ACMI) | 2,668 | 2,890 | 3,349 | 8,171 | | 28,285 |
| Block Hours (Charter less ACMI) | 410 | 477 | 497 | 1,182 | | 5,251 |
| Cycles (Total less ACMI) | 1,007 | 1,060 | 1,209 | 3,275 | | 11,322 |
| Cycles Scheduled | 849 | 920 | 1,056 | 2,825 | | 9,396 |
| Cycles (Charter less ACMI) | 158 | 140 | 153 | 450 | | 1,926 |

## Sun Country Airlines
## Financial Projections
## Balance Sheet Summary

*(In 000s of US$)*

| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| --- | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: |
| | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 |
| Cash | 9,320 | 7,828 | 8,845 | 14,680 | 10,984 | 8,058 | 9,451 | 12,007 | 14,220 | 11,956 | 8,870 | 10,183 | 13,610 |
| Restricted Escrow Cash | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 |
| Short Term Investments | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 | 1,088 |
| Receivables | 28,207 | 33,501 | 30,579 | 20,106 | 21,741 | 26,676 | 27,211 | 22,662 | 17,850 | 18,782 | 24,618 | 28,034 | 31,205 |
| Expendable Parts | 439 | 439 | 439 | 439 | 439 | 439 | 439 | 439 | 439 | 439 | 439 | 439 | 439 |
| Prepaid Expenses | 3,449 | 2,626 | 3,450 | 3,130 | 3,499 | 3,656 | 3,635 | 3,280 | 2,509 | 2,357 | 2,191 | 2,061 | 1,995 |
| Short Term Lessor Reserve | 797 | 852 | 912 | 980 | 1,031 | 1,083 | 1,148 | 1,222 | 916 | 519 | 128 | 187 | 251 |
| WIP | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 |
| **Total Current Assets** | 45,568 | 48,602 | 47,581 | 42,690 | 41,050 | 43,268 | 45,240 | 42,366 | 39,291 | 37,409 | 39,602 | 44,260 | 50,856 |
| Rotable Inventory | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 | 1,720 |
| Fixed Assets | 26,771 | 26,771 | 26,771 | 26,771 | 26,771 | 26,771 | 26,771 | 26,771 | 27,171 | 27,646 | 28,121 | 28,121 | 28,121 |
| Accumulated Depreciation | (11,616) | (12,145) | (12,675) | (13,204) | (13,733) | (14,262) | (14,789) | (15,316) | (15,833) | (16,374) | (16,932) | (17,505) | (18,073) |
| Fixed Assets, net | 16,875 | 16,345 | 15,816 | 15,286 | 14,757 | 14,228 | 13,702 | 13,175 | 13,052 | 12,992 | 12,909 | 12,336 | 11,767 |
| Capitalized Leased Assets | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 | 9,660 |
| Accum. Amort. Capital Leases | (1,330) | (1,365) | (1,400) | (1,435) | (1,470) | (1,505) | (1,540) | (1,575) | (1,610) | (1,645) | (1,680) | (1,715) | (1,750) |
| Cap. Leased Assets, net | 8,330 | 8,295 | 8,260 | 8,225 | 8,190 | 8,155 | 8,120 | 8,085 | 8,050 | 8,015 | 7,980 | 7,945 | 7,910 |
| A/C Lease Deposits | 9,249 | 9,249 | 9,249 | 9,249 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 | 8,849 |
| Long Term Lessor Reserve | 14,759 | 15,255 | 15,792 | 16,401 | 16,858 | 17,327 | 17,911 | 18,578 | 19,213 | 19,652 | 20,158 | 20,683 | 21,262 |
| Other Assets | 19,256 | 19,151 | 19,046 | 19,191 | 19,086 | 18,980 | 19,125 | 19,020 | 18,915 | 19,060 | 18,954 | 18,849 | 18,994 |
| **Total Other Assets** | 43,264 | 43,655 | 44,087 | 44,841 | 44,793 | 45,157 | 45,886 | 46,448 | 46,977 | 47,561 | 47,962 | 48,382 | 49,105 |
| **Total Assets** | 114,037 | 116,897 | 115,744 | 111,042 | 108,790 | 110,808 | 112,948 | 110,073 | 107,370 | 105,977 | 108,453 | 112,923 | 119,638 |
| DIP | | - | | | | | | | | | | | |
| Unearned Revenue | 25,722 | 28,242 | 25,783 | 16,410 | 17,934 | 22,978 | 23,564 | 19,135 | 14,916 | 17,167 | 20,294 | 23,275 | 27,498 |
| Notes Payable | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 | 56,906 |
| Accounts Payable | 14,907 | 14,682 | 15,019 | 16,839 | 14,145 | 13,641 | 15,807 | 15,030 | 14,722 | 14,804 | 13,840 | 14,024 | 15,432 |
| Accrued Aircraft Leases | 6,607 | 6,323 | 6,038 | 5,754 | 5,685 | 5,543 | 5,402 | 5,260 | 5,110 | 4,958 | 4,806 | 4,646 | 4,483 |
| Accrued Vacation, Payroll, Profit Share | 4,137 | 3,720 | 3,976 | 4,573 | 4,358 | 3,725 | 3,839 | 4,237 | 4,478 | 3,970 | 3,974 | 3,985 | 4,025 |
| Other Accrued Liabilities | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 | 5,731 |
| Transportation Taxes | 5,645 | 7,343 | 6,704 | 4,267 | 4,125 | 4,596 | 4,713 | 3,827 | 2,983 | 3,433 | 4,465 | 5,586 | 6,600 |
| **Total Current Liabilities** | 119,655 | 122,946 | 120,156 | 110,478 | 108,883 | 113,120 | 115,960 | 110,127 | 104,846 | 106,969 | 110,016 | 114,153 | 120,675 |
| Capital Lease Obligations | 10,652 | 10,653 | 10,653 | 10,653 | 10,654 | 10,654 | 10,655 | 10,655 | 10,655 | 10,655 | 10,655 | 10,656 | 10,656 |
| LT Accr. Return Provisions | 3,570 | 3,581 | 3,593 | 3,605 | 3,616 | 3,628 | 3,640 | 3,651 | 3,663 | 3,675 | 3,686 | 3,698 | 3,710 |
| **Total Liabilities** | 133,877 | 137,180 | 134,403 | 124,736 | 123,153 | 127,402 | 130,254 | 124,433 | 119,164 | 121,299 | 124,358 | 128,507 | 135,040 |
| Member Equity | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 |
| Ending Retained Earnings | (46,840) | (47,283) | (45,659) | (40,694) | (41,363) | (43,594) | (44,307) | (41,359) | (38,793) | (42,323) | (42,905) | (42,584) | (42,402) |
| **Total Member Equity** | (19,840) | (20,283) | (18,659) | (13,694) | (14,363) | (16,594) | (17,307) | (14,359) | (11,793) | (15,323) | (15,905) | (15,584) | (15,402) |
| **Total Liab. & Member Equity** | 114,037 | 116,897 | 115,744 | 111,042 | 108,790 | 112,948 | 112,948 | 110,073 | 107,370 | 105,977 | 108,453 | 112,923 | 119,638 |
| **Balance Check** | - | - | - | - | - | - | - | - | - | - | - | - | - |

**EXHIBIT 4**

# LIQUIDATION ANALYSIS

DRAFT
SUBJECT TO MATERIAL CHANGE

## Sun Country Airlines
### Summary of Estimated Asset Liquidation/Recovery Values [1]

| (In 000s of US$) Statement of Assets | Note | Book Values as of 2/28/2010 (unaudited) | Estimated Recovery | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | High | Mid | Low | High | Mid |
| Cash | 1 | $ 10,377.9 | 100.0% | 100.0% | 100.0% | $ 10,377.9 | $ 10,377.9 | $ 10,377.9 |
| Restricted Escrow Cash | 2 | 717.6 | 0.0% | 0.0% | 0.0% | - | - | - |
| Short Term Investments | 3 | 1,175.0 | 5.0% | 15.0% | 10.0% | 58.7 | 176.2 | 117.5 |
| Receivables | 4 | 33,503.9 | 5.0% | 15.0% | 10.0% | 1,675.2 | 5,025.6 | 3,350.4 |
| Expendable Parts | 5 | 534.0 | 10.0% | 30.0% | 20.0% | 53.4 | 160.2 | 106.8 |
| Prepaid Expenses | 6 | 3,464.6 | 0.0% | 0.0% | 0.0% | - | - | - |
| Short Term Lessor Reserves | 7 | 781.1 | 0.0% | 0.0% | 0.0% | - | - | - |
| WIP | 8 | (57.5) | 0.0% | 0.0% | 0.0% | - | - | - |
| Rotable Inventory | 9 | 1,293.9 | 40.0% | 60.0% | 50.0% | 517.6 | 776.3 | 646.9 |
| Fixed Assets | 10 | 14,562.3 | 0.0% | 5.0% | 2.5% | - | 728.1 | 364.1 |
| Capitalized Leased Assets | 11 | 8,260.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| A/C Lease Deposits | 12 | 9,325.1 | 0.0% | 0.0% | 0.0% | - | - | - |
| Long Term Lessor Reserves | 13 | 15,932.1 | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | 14 | 19,035.1 | 0.0% | 2.5% | 1.3% | - | 475.9 | 237.9 |
| **Total** | | **$ 118,905.1** | **10.7%** | **14.9%** | **12.8%** | **$ 12,682.8** | **$ 17,720.3** | **$ 15,201.5** |

| | | |
|---|---|---|
| Net estimated proceeds available for distribution (midpoint of range) before liquidation costs | | $ 15,201.5 |

**ASSUMED LIQUIDATION COSTS**

| | | |
|---|---|---|
| Professional Fees | 15 | $ (100.0) |
| Chapter 7 Trustee Fees | 16 | (144.7) |
| Wind-Down Expenses | 17 | (200.0) |

| | |
|---|---|
| Net estimated proceeds available for Claim distribution | $ 14,756.8 |

### Summary of Distribution to Claimants [1]

| (In 000s of US$) | Note | Claim Amt. | Recovery Amt. | Recovery % |
|---|---|---|---|---|
| **ADMINISTRATIVE/PRIORITY CLAIMS** | 18 | | | |
| Bankruptcy Professionals Fees | | $ 530.0 | $ 530.0 | 100.0% |
| Claims Related to Executory Contracts Assumed | | 1,740.0 | 1,740.0 | 100.0% |
| PAL Claims Related to Debt Service/Lease Payments on 810 & 811 | | - | - | 100.0% |
| Post-Petition Trade Claims | | - | - | 100.0% |
| Priority Tax Claims | | 375.0 | 375.0 | 100.0% |
| Former Employee Wage/Benefits Claims | | 43.0 | 43.0 | 100.0% |
| Other Employee Claim (arising out of Chapter 7 liquidation) | | 3,775.0 | 3,775.0 | 100.0% |
| **Total Administrative/Priority Claims** | | **$ 6,463.0** | **$ 6,463.0** | **100.0%** |

| | |
|---|---|
| Net estimated proceeds available for Unsecured Creditors distribution | $ 8,293.8 |

| (In 000s of US$) | Note | Claim Amt. | Recovery Amt. | Recovery % |
|---|---|---|---|---|
| **GENERAL UNSECURED CLAIMS** | 19 | | | |
| **Claims by Known Claimants** | | | | |
| Petters Aviation Unsecured Note Claims | | $ 15,145.0 | $ 953.9 | 6.3% |
| Petters Group Worldwide Unsecured Note Claims | | 11,276.0 | 710.2 | 6.3% |
| WhiteBox Unsecured Note Claims | | 27,295.0 | 1,719.1 | 6.3% |
| Claims Related to Executory Contracts Rejected (in Chapter 11) | | 1,667.4 | 105.0 | 6.3% |
| Claims Related to Rejection of 810 & 811 Aircraft | | 12,000.0 | 755.8 | 6.3% |
| Pre-Petition Trade Claims | | 3,277.0 | 206.4 | 6.3% |
| Litigation Damages | | 433.5 | 27.3 | 6.3% |
| Convertible Debt Claim (against Holdings) | | 9,927.2 | 625.2 | 6.3% |
| **Claims Expected in Liquidation** | | | | |
| Aircraft Rejection/Deficiency Claims | | 46,114.1 | 2,904.4 | 6.3% |
| Other Executory Contract Rejection Claims | | 4,550.0 | 286.6 | 6.3% |
| **Total General Unsecured Claim** | | **$ 131,685.1** | **$ 8,293.8** | **6.3%** |

**Notes:**
(1) Amounts are management estimates. Balance Sheet amounts are unaudited

DRAFT
SUBJECT TO MATERIAL CHANGE

# LIQUIDATION ANALYSIS

## ASSUMPTIONS TO ACCOMPANY HYPOTHETICAL LIQUIDATION ANALYSIS

### A.          Introduction and Reservations

In connection with the Plan and Disclosure Statement, the following hypothetical liquidation analysis (the **"Liquidation Analysis"** or the "**Analysis")** has been prepared by the Debtors' management with the assistance of the Debtors' advisors.

This Liquidation Analysis indicates the values that might be obtained by classes of Claims upon the disposition of assets, pursuant to liquidation, as an alternative to continued operations. The Liquidation Analysis is based upon the assumptions discussed below and should be read in conjunction with the Plan and the Disclosure Statement.

The Debtors, with the assistance of their financial advisors, have prepared this Liquidation Analysis for the purpose of evaluating whether the Plan meets the so-called "best interests" test under Section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis has been prepared assuming hypothetically that the Debtors' Chapter 11 Cases were converted to chapter 7 proceedings under the Bankruptcy Code as of February 28, 2010 (the "**Liquidation Date"**) and their assets were to be liquidated[1]. A chapter 7 trustee ("**Trustee"**) would be appointed to commence the liquidation of all of the Debtors' assets. To maximize recovery, the liquidation is assumed to occur over a 12- to 18-month period (the "**Wind-Down Period"**), with the majority of the asset sales occurring between months 6 and 12.

The Liquidation Analysis is based on the unaudited book values of the Debtors' assets and liabilities as of February 28, 2010, unless otherwise stated, and these book values are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date. The Liquidation Analysis does not include recoveries resulting from any potential preference claims, fraudulent conveyance litigation or other avoidance actions.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon hypothetical liquidations whereby assets would be converted into cash. We have provided a range of values for each balance sheet line item set forth in the attached analysis, with the low end of the range assuming a forced liquidation scenario and the high end of the range assuming an orderly liquidation scenario. The determination of the hypothetical proceeds from the liquidation of assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by Management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and its Management.

---

[1] The Analysis is based on the unaudited monthly financial statements of the Debtors as of February 28, 2010.

DRAFT
SUBJECT TO MATERIAL CHANGE- FOR DISCUSSION PURPOSES ONLY

ACCORDINGLY, NEITHER THE DEBTORS NOR ITS ADVISORS MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THE CHAPTER 11 CASES WERE CONVERTED TO CHAPTER 7, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE LIQUIDATION ANALYSIS.

The Liquidation Analysis indicates the estimated values that might be obtained upon disposition of assets pursuant to a hypothetical chapter 7 liquidation, as an alternative to continued operation of the Debtors' businesses as proposed under the Plan. Accordingly, values discussed herein are different than amounts referred to in the Plan, which illustrates the value of the Debtors' businesses on a going concern basis. The Analysis assumes that all operations of the Debtors would cease immediately upon liquidation, all Debtors would liquidate simultaneously and the Debtors' assets would be disposed of primarily through sale, liquidation and/or termination, as appropriate, as opposed to its sale as a going concern.

In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims based upon their business judgment and their review of the most recently available scheduled Claims and Proofs of Claims associated with pre-petition and post-petition obligations. Additional claims were estimated to include certain post-petition obligations on account of which Claims have not been asserted, but which would be asserted in a hypothetical chapter 7 liquidation. The Debtors estimate that these potential Claims would include employee-related obligations, certain lease rejection claims and other executory contracts rejection claims. No Order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts of Allowed Claims set forth in the Analysis. In addition, in the event litigation were necessary to resolve Claims asserted in a chapter 7 liquidation, the delay could be prolonged and Claims could further increase. The effects of this delay on the value of distributions under the hypothetical liquidation have not been considered. THE ESTIMATE OF THE AMOUNT OF ALLOWED CLAIMS SET FORTH IN THE LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER A PLAN OF REORGANIZATION. THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD MATERIALLY DIFFER FROM THE AMOUNT OF CLAIMS ESTIMATED IN THE ANALYSIS. THE RECOVERIES WILL ALSO CHANGE BASED ON FURTHER REFINEMENTS OF ALLOWED CLAIMS AS THE DEBTORS' CLAIM OBJECTION AND RECONCILIATION PROCESS CONTINUES. THE DEBTORS EXPRESSLY DISCLAIM ANY OBLIGATION OR INTENTION TO UPDATE THIS LIQUIDATION ANALYSIS AFTER THE DATE HEREOF ON ANY BASIS (INCLUDING NEW OR DIFFERENT INFORMATION RECEIVED AND/OR ERRORS DISCOVERED).

DRAFT
SUBJECT TO MATERIAL CHANGE- FOR DISCUSSION PURPOSES ONLY

**B.**            **Assumptions and Notes**

The Liquidation Analysis refers to certain categories of Assets, liquidation costs, and Claims. The following notes describe significant assumptions associated within each category.

**Assets**

1.       **Cash** includes cash in the Debtors' bank accounts as of the Liquidation Date. The estimated recovery from this category of assets, as adjusted, is 100%.

2.       **Restricted Escrow Cash** includes cash deposits on future charter flights. It is assumed that there will be no recovery on the Restricted Escrow Cash held by the Debtor's.

3.       **Short Term Investments** include CD's held by Alliance Bank backing up Debtor's letters of credit for the benefit of Debtors' services providers among which are various airport authorities and Global Distribution Services.. Based on the Debtors' estimates, the blended recovery for Short Term Investments is projected to be 5% to 15%.

4.       **Receivables** include amounts owed to the Debtors by various parties, mainly comprised of credit card receivables, held by the credit card company until several days after the associated flight is completed. Based on the Debtors' estimates, the blended recovery for Receivables is projected to be 5% to 15%.

5.       **Expendable Parts** include expendable inventory items to support the fleet, uniforms and passenger related convenience items. Based on the Debtors' estimates, the blended recovery for Expendable Parts is projected to be 10% to 30%.

6.       **Prepaid Expenses** include items such as insurance premiums, advance rent payments and selling costs such as global distribution system, credit card fees and other items utilized to represent the difference between cash and accounting treatment of expenses. Some of these prepayments would likely be consumed during the Wind-Down Period and other amounts likely would be offset against other obligations. It is assumed that there will be no recovery on the Prepaid Expenses held by the Debtor's.

7.       **Short Term Lessor Reserves** includes amounts paid to aircraft lessors for heavy maintenance required on the aircraft and engines within the next 12 months. It is assumed that there will be no recovery on the Short Term Lessor Reserves.

8.       **WIP** includes work that has not been completed but has already incurred a capital investment from the Debtor and is mainly comprised of the Debtor's capitalized programming and investments in the Company's website. It is assumed that there will be no recovery on the WIP held by the Debtor's.

9.       **Rotable Inventory** includes rotable spare parts. Based on the Debtors' estimates, the

DRAFT
SUBJECT TO MATERIAL CHANGE- FOR DISCUSSION PURPOSES ONLY

blended recovery for Rotable Inventory is projected to be 40% to 60%.

10. **Fixed Assets** include leasehold improvements on leased aircraft as well as equipment to support the Debtors' operations in Minneapolis as well as a number of other airport locations. Such equipment includes vehicles, ground power units, tugs, tow bars and maintenance tooling to support the heavy maintenance operation in Minneapolis. No recovery is expected for leasehold improvements as such improvements contractually accrue for the benefit of the lessor. Based on the Debtors' estimates, the blended recovery for Fixed Assets is projected to be 0% to 5%.

11. **Capitalized Leased Assets** includes the capitalized lease for the hangar near the Humphrey Terminal at Minneapolis – St. Paul International Airport. It is assumed there will be no recovery for Capitalized Leased Assets.

12. **A/C Lease Deposits** includes security deposits on leased aircraft. No recovery is assigned to these deposits as it is expected that such deposits will be offset against other obligations owed, including but not limited to aircraft lease rejection damage claims.

13. **Long Term Lessor Reserves** include amounts paid to aircraft lessors for heavy maintenance on engines and aircraft that is scheduled for more than 12 months in the future. It is assumed that there will be no recovery on the Long Term Lessor Reserves.

14. **Other Assets** include goodwill that represents the excess of purchase price over the fair value of net assets acquired in past transactions, as well as trademarks associated with the Debtor's intellectual property. Other Assets also include the Debtor's Operating Certificate that is estimated to have a no recovery value. It is possible that there is a recovery value for the Frequent Flyer Program, brand trademarks or other intellectual property; however, a valuation has not been performed for the purpose of the analysis. A nominal recovery value of 0% to 2.5% has been assigned to Other Assets.

### Liquidation Costs

Costs specifically related to the liquidation of individual assets and all other costs associated with the liquidation will be included in Liquidation Costs, except where noted. The Liquidation Costs include the following:

15. **Professional Fees.** During the liquidation period, it would be necessary for the Chapter 7 Trustee to engage the services of various professionals to assist in the liquidation including, but not necessarily limited to, counsel, accountants, financial advisors, investment bankers, and brokers.

16. **Chapter 7 Trustee Fees** are calculated based on the statutory escalating scale set forth in section 326 of the Bankruptcy Code, which provides for fees not to exceed 25.0% of the first $5,000 of proceeds, 10.0% of the next $45,000 of proceeds, 5.0% of the next $950,000 of

DRAFT
SUBJECT TO MATERIAL CHANGE- FOR DISCUSSION PURPOSES ONLY

proceeds, and reasonable compensation not to exceed 3.0% for all proceeds in excess of $1,000,000. Accordingly, Trustee fees are assumed to be approximately 3% of the gross proceeds from the liquidation of the assets (excluding the cash balance as of February 28, 2010).

**17.** **Wind-Down Expenses** includes estimated expenses incurred during the Wind-Down Period, related primarily to employee wages and benefits for personnel employed during the Wind-Down Period, aircraft parking and transportations costs, auction fees and general overhead costs. For purposes of this Analysis, the Debtors estimate these Claims at 4.0% of asset recovery (excluding the cash balance as of February 28, 2010).

### Claims[2]

**18.** **Administrative and Priority Claims** includes claims associated with Bankruptcy Professionals Fees, Claims Related to Executory Contracts Assumed, PAL Claims Related to Debt Service/Lease Payments on the 810 & 811 aircraft leases that were in use by the Debtors in the period following the filing for Chapter 11 and June 2009 (until leases were rejected by the Debtors), Post-Petition Trade Claims, Priority Tax Claims, Former Employee Wage/Benefits Claims and Other Employee Claims (arising out of Chapter 7 liquidation), which include accrued vacation equal to approximately $2.0 million, self funded health insurance equal to $375,000, and payment of two weeks salaries for Company employees that is estimated to equal $1.4 million. Company wages policy is payment in arrears one week following a two weeks payment period. Since analysis assumes liquidation on February 28, 2010, an amount equal to $1.4 million of owed salaries for the last two weeks of February 2010 is a pending claim against the company.

**19.** **General Unsecured Claim** includes claims made by known claimants as well as claims expected in liquidation.

    a) Claims by known claimants include Petters Aviation and Petters Group Worldwide Unsecured Note Claims, WhiteBox Unsecured Note Claims, Claims Related to Executory Contracts Rejected, Claims Related to Rejection of 810 & 811 Aircraft, Pre-Petition Trade Claims, Litigation Damages and MN Holdings Unsecured Note Claim (Intercompany).

    b) Claims expected in liquidation include Aircraft Rejection/Deficiency Claims and Other Executory Contract Rejection Claims.

---

[2] The amounts of estimated claims are subject to substantial revision based on the results of claim objections. The amounts listed are estimates of management.

DRAFT
SUBJECT TO MATERIAL CHANGE- FOR DISCUSSION PURPOSES ONLY