## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: ) | **Chapter 11** |
| ) | |
| **MN AIRLINES, LLC d/b/a** ) | **Case No. 08-35197 (RJK)** |
| **SUN COUNTRY AIRLINES,** ) | |
| ) | |
| **Debtor.** ) | |
| ) | |
| **THE OFFICIAL COMMITTEE OF** ) | **Adversary Proceeding No.** |
| **UNSECURED CREDITORS OF MN** ) | |
| **AIRLINES, LLC d/b/a., SUN** ) | |
| **COUNTRY,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **-against-** ) | |
| ) | |
| **GARY S. KOHLER,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") of MN

Airlines, LLC d/b/a Sun Country (the "Debtor" or "Sun Country" ), by and through its

undersigned counsel, on behalf of the estate of Sun Country files this Complaint with the consent

of the Debtor and alleges upon information and belief after reasonable investigation as follows:

## SUMMARY OF THE ACTION

1.      This adversary proceeding is brought by the Committee on behalf of the estate of

Sun Country and its creditors seeking to disallow the alleged claims asserted by Gary S. Kohler

("Kohler") or, in the alternative, to recharacterize any alleged debt incurred to Kohler by Sun

Country as a contribution to capital and, in either case, to recover consideration paid to Kohler

on account of Sun Country's alleged obligation.

2.      Kohler asserts a pre petition claim of $244,311 against Sun Country and a post

petition claim of $206,871.  These claims arise from a two page investment agreement (described

more fully below), pursuant to which Kohler contributed a mere $105,000 expressly to the startup expenses of the Sun Country VIP Club (the "VIP Club") in exchange for the payment of $3.00 per member for the life of the program. Kohler has already received $506,936 pursuant to the arrangement -- $215,729 from Sun Country and $291,207 from Accredited Only, Inc. ("AOI") on Sun Country's behalf from revenue due Sun Country.

3. In sum, if allowed, these claims together with the payments already received by Kohler represent a return on a capital contribution well in excess of the value of the contribution itself. The payments were made to Kohler and the alleged obligation incurred while Sun Country was unable to meet its obligations to its creditors. Accordingly, the Committee seeks to have Kohler's claims for additional recovery disallowed and to recover excess payments made to Kohler.

## JURISDICTION, VENUE AND STATUTORY BASES FOR RELIEF

4. This Court has jurisdiction over this case and this adversary proceeding pursuant to 28 U.S.C. §§157(a), (b)(1) and 1334(b) and (e).

5. This adversary proceeding is a core matter pursuant to 28 U.S.C. §§157(b)(2)(B), (K) and (O).

6. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§1408 and 1409 because this is a proceeding arising under, arising in or related to a case under the Bankruptcy Code which case is currently pending in the Bankruptcy Court for the District of Delaware.

7. Sections 105, 502, 542 and 548 of the Bankruptcy Code and Rules 7001(1), (2), and (8) of the Federal Rules of Bankruptcy Procedure are the predicates for the relief sought by this adversary proceeding.

## PARTIES

8.      Plaintiff, the Committee, a statutory committee, was appointed on October 9, 2008 by the United States Trustee for the District of Minnesota, pursuant to §1102 of the Bankruptcy Code.  The Committee brings this action on behalf of the Debtor's estate with the consent of the Debtor.

9.      Defendant Kohler is an individual residing at 11554 Cedar Pass, Hopkins, Minnesota.  On information and belief, Defendant Kohler is a principal of Whitebox Advisors, LLC ("Whitebox") and a managing director of one or more of its affiliated funds.  Whitebox and affiliated funds acquired Sun Country through Sun Minnesota Foreign Holdings, LLC, and Sun Minnesota Domestic Holdings, LLC in October 2006.  On information and belief, Kohler also individually held warrants to purchase interests in Sun country at the time of the contribution.

## FACTUAL BACKGROUND

10.      The Debtor filed a voluntary petition for relief in this Court under Chapter 11 on October 6, 2008 (the "Petition Date").  The Debtor continues in the possession of all its property and in the management and operation of its businesses as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

11.      Sun Country is domestic low-cost airline headquartered in the Minneapolis-St. Paul suburb of Mendota Heights, Minnesota.  Sun Country uses Minneapolis-Saint Paul International Airport as its main hub and flies scheduled and charter flights from the Humphrey terminal to destinations in the United States, Mexico, and the Caribbean

### The VIP/UFLY program

12.      In 2004, Sun Country announced a new loyalty program entitled the "Sun Country VIP Club." This program was not and is not the airline's frequent flyer program.  Rather, it grants the Club's members the right to purchase airline tickets on Sun Country flights

at the price of $39 plus $.10 per mile traveled for domestic travel, or $89 plus $.10 per mile for international travel. These VIP Club members can purchase these tickets up to one day in advance of travel.  Membership in the program currently costs $99 plus either $12 per month for an individual or $17 per month for a family.  The rate has varied through the relevant period as set by Sun Country.

13.     In addition to the VIP Club-only fares, members may also receive discounts on first class air fares, board Sun Country flights when the first class passengers do, enjoy "priority lane" status at security "VIP" status at check in at Sun Country ticket counters at Minneapolis and in other cities. The VIP Club benefits also include special hotel rates, discounts on travel services, lifestyle benefits, etc., that are only available to Club members.

14.     In July 2007, Sun Country announced its first traditional airline frequent flyer program named "Ufly.".

15.     After the Ufly frequent flyer program was launched, the VIP Club was renamed 'Ufly Rewards Plus." The same benefits remained and members now also earn points for their travel.

**Kohler's Investment Agreement and Related Agreements**

16.     Kohler's claims arise directly out of an agreement to fund the startup costs of VIP program effective as of December 23, 2003, called the Sun Country VIP Club Investment Agreement (the "Investment Agreement").  A true and correct copy of the Investment Agreement is attached hereto as Exhibit A.

17.     Pursuant to the Investment Agreement, Kohler, identified as the "investor" in the document, agreed to fund startup expenses of the VIP Club "through an **investment** of $105,000 in exchange for payments from SCA to be derived from dues paid by members of the VIP Club."

(emphasis added)  Specifically, Sun Country agreed to pay Kohler $3.00 per membership in the VIP Club per month for the life of the program.

18.     By virtue of the Investment Agreement, which has no maturity or termination date and no fixed rate of return on the investment, Kohler has been able to recover a return on his contribution that is more than four times greater than his contribution ($506,936 already received on a $105,000 investment) and to seek substantially more -- at $288,496 plus future accruals -- as a prepetition claim and administrative claim.  If all amounts were paid to Kohler through March 30, 2010, he would take away a total of $795,432 for a paltry $105,000 investment.

19.     Kohler is not the only party sharing handsomely in the revenue of the VIP Program.  Kohler's Investment Agreement is an express condition precedent to marketing agreement between Sun Country and AOI, dated as of February 20, 2004 (the "Initial Joint Marketing Agreement").  A true and correct copy of the Initial Joint Marketing Agreement is annexed hereto as Exhibit "B".

20.     The Initial Joint Marketing Agreement set up a joint venture between AOI and Sun Country to jointly create and manage a subscription membership program for the airline. The term of the agreement was three years unless the VIP Program was terminated before that time.

21.     To that end, the Initial Joint Agreement set forth the responsibilities of each of the parties.  AOI was responsible for (a) the design of a website and its integration with the Sun Country web site; (b) creation of a value benefit portfolio of products and services to offer members; (c) marketing and marketing expenses; (d) billing and data processing for the Joint Venture; (e) customer call center; (f) design of marketing brochure, newsletter, etc.; and (g) ongoing program and benefit management support for the joint venture.

22.     Sun Country was responsible for (a) establishing the membership and fare pricing; and (b) providing the Joint Venture with more favorable fares.  In addition, Sun Country was to provide (a) the technical support to allow development and integration of the Joint Venture web site and booking with the Sun Country web site; (b) provide booking and credit card bill for booking and flights; (c) advice and assistance to AOI in marketing, including making selected flight attendants and call center personnel available; (c) provide content for the joint Venture newsletter.

23.     Kohler had no responsibilities or duties under the Initial Marketing Agreement.  However, by viture of its control over the billing and collection of the VIP Club revenue and its ties to Kohler, AOI was able to use VIP Program revenue, otherwise payable to Sun Country, to pay Kohler.

24.     Pursuant to the Initial Marketing Agreement, AOI agreed to pay Sun Country $35 per member and to retain an operations fee of $4.65 per membership, per month up to 9,999 members, an operations fee $3.25 per month for 10,000 to 24,9999 members and $2.75 per month of all members over 25,000.  In addition, Sun Country was to pay AOI $1.00 for every ticket booked through the Joint Venture.

25.     Under the Initial Marketing Agreement, Sun Country  maintained the ownership of the intellectual property developed for the agreement.

26.     In October, 2006, Whitebox and its affiliates and Thomas Petters acquired Sun Country.  On information and belief, some of the Whitebox principals were founding investors in AOI.  AOI's address was originally registered as 3033 Excelsior Blvd in Minneapolis, which is also Whitebox's address.

27.     On June 1, 2007, AOI and Sun Country entered into a revised Joint Marketing Agreement (the "Revised Marketing Agreement") for an additional term of three years. A true and correct copy of the Revised Marketing Agreement is annexed hereto as Exhibit "C".

28.     During the period covered by the Revised Marketing Agreement, the parties continued to have virtually the same responsibilities as they each accepted under the Initial Market Agreement. AOI committed to provide (a) services of AOI technicians to integrate the AOI site and booking engine in Sun Country's site; (b) access to a "high value" benefit portfolio, including restaurant benefits and other miscellaneous service and product benefits; (c) billing and data processing for the joint venture; (d) customer call center; (e) program and benefit management support; (f) assistance in integrating the venture program into Sun Country's frequent flyer program.

29.     Sun Country agreed to (a) establish pricing for the joint venture, (b) discount airfare for the joint venture and (c) marketing efforts.

30.     Kohler had no responsibilities or duties under the Revised Marketing Agreement. However, by virtue of its control over the billing and collection of the VIP Club revenue and its ties to Kohler, AOI was able to use VIP Program revenue otherwise payable to Sun Country to pay Kohler.

31.     Pursuant to the Marketing Agreement, AOI was to receive (a) 30% of the program revenue; (b) $1.00 for every ticket booked through the program; (c) a monthly stipend of $16,667 during the term of the agreement; and (d) an additional monthly payment of $6,950 during the first year and only the first year of the term, which amount was purportedly reimbursement to AOI for 50% of its estimated expenses for rebranding due to Sun Country's implementation of its frequent flyer program. AOI has continued to collect this fee

notwithstanding the fact that the Revised Marketing Agreement requires a reduction of the reimbursement.

32.     In contrast the Initial Marketing Agreement, under the Revised Marketing Agreement, AOI retained intellectual property-- the website, the interface with SCA's booking engine, all software hardware and systems developed or acquired by AOI pursuant to the Marking Agreement or otherwise.  In fact, AOI is patenting a system and method for managing travel clubs that was developed and financed essentially through Sun Country VIP Program revenue.  The VIP Program remains the primary travel club program of the company.

**The Claims**

33.     On March 5, 2009, Kohler filed a proof of claim in the amount of $244,311, based upon money purportedly due him under the Investment Agreement.  Kohler amended the claim (the "Kohler Claim") on March 6, 2009, to add the Investment Agreement s an exhibit.  A true and correct copy of the claim is annexed hereto as Exhibit "D".

**COUNT ONE**

**(RECHARACTERIZATION OF DEBT AS EQUITY)**

34.     The Committee restates and incorporates by reference the allegations contained in Paragraphs 1 through 33 above as if set forth herein at length.

35.     The Court has the authority to examine a particular transaction and determine, from the evidence that a transaction is more properly characterized as a contribution to the equity than as a loan.

36.     The critical factors bankruptcy courts typically consider in the recharacterization of debt to equity are present here.

37.     The Agreement is denominated an "Investment Agreement" and Kohler is called an "Investor."

38.     The purpose of the contribution is to fund the "startup expenses" of new venture for Sun Country, as well as for Kohler and AOI.

39.     The Investment Agreement has no maturity date or rate of return of interest.

40.     Kohler held equity interests in Sun Country and is a principal of Whitebox, which acquired an equity interest in the Debtor in 2007.

41.     In sum, the Investment Agreement has virtually none of the features of a loan and most closely resembles an equity investment.

42.     By virtue of the foregoing, the Committee requests that the Court find that Kohler's alleged claims arising from the Investment Agreement are contributions to capital of the new joint venture and not a debt that must be paid together with the claims of unsecured creditors.

**COUNT TWO**

**(OBJECTION TO CLAIM)**

43.     The Committee restates and incorporates by reference the allegations contained in Paragraphs 1 through 42 above as if set forth at length herein.

44.     Kohler filed proofs of claim related to alleged debt claims against the Debtor, and certain allegedly administrative debt claims of Kohler have been listed on the Debtor's schedules and other financial reports.

45.     As stated above, Kohler's alleged claim is more properly characterized as equity than a claim, payable with the claims of unsecured creditors.

46.     The Bankruptcy Code sets forth a priority scheme that requires the payment of creditor claims before equity

47.     In addition, Kohler has already received payments far in excess of the amounts and the value contributed.

48.     Based on the allegations contained above, Plaintiff objects to any and all proofs of claims said Defendant has filed or may file against the Debtor or that may have been scheduled or otherwise reported to the extent that Defendant seeks to have such claims allowed..

49.     Plaintiff requests that, under 11 U.S.C. §502(d), Defendants receive no distribution from the Debtor's estate under any plan of reorganization or otherwise unless and until all, fees, interest and distributions of any type received by the Defendant, or the value thereof, are returned to the estate.

50.     Plaintiff reserves the right to submit further objections and other pleadings as permitted by the Court or as otherwise appropriate.

## COUNT THREE

### (Avoidance and Recovery of Fraudulent Transfer Pursuant to 11 U.S.C. §§548(a)(1)(B) and 550)

51.     Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 50 as if set forth at length herein.

52.     Plaintiff is informed and believes that, Sun Country paid in excess of $390,000 within two years prior to the Petition Date either directly by Sun Country or on its behalf by AOI.  In addition, Sun Country incurred an obligation to Kohler to make payments to Kohler through the life of the VIP Program

53.     Plaintiff is informed and believes that Sun Country received less than reasonably equivalent value in exchange for the amounts paid and for incurring the obligation to perform under the Investment Agreement.

54.     At all relevant times, Sun Country was (a) insolvent or became insolvent as a result of performing the services, (b) engaged or was about to engage in a business for which the remaining assets were unreasonably small in relation to its business, or (c) intended to incur or

believed or reasonably should have believed that it would incur debts beyond its ability to pay as they matured.

55. Based on the above, Sun Country alleges that Sun Country's transfer of the money to Kohler and Sun Country's incurring of the obligation to Kohler may be avoided by Plaintiff pursuant to 11 U.S.C. §548(a)(1)(A) and may be recovered for the benefit of the unsecured creditors in this Case.

56. Kohler is the initial transferee of the monthly payments, and the Plaintiff is entitled to recover the value of the money paid to Kohler, less any amounts paid by Kohler to Sun Country.

## COUNT FOUR

### Fraudulent transfer under Minnesota Law and 11 U.S.C. §§548(a)(1)(B) and 550)

57. The Committee restates and incorporates by reference the allegations contained in Paragraphs 1 through 56 above as if set forth at length herein.

58. Plaintiff is informed and believes that, Sun Country paid in excess of $460,000 within six years prior to the Petition Date either directly by Sun Country or on its behalf by AOI. In addition, Sun Country incurred an obligation to Kohler to make payments to Kohler through the life of the VIP Program

59. Plaintiff is informed and believes that Sun Country received less than reasonably equivalent value in exchange for the amounts paid and for incurring the obligation to perform under the Investment Agreement.

60. The Minnesota Uniform Fraudulent Transfer Act, Minn. Stat. § 513.41 et seq. (MUFTA), provides, in relevant part:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

61.    The Committee believes that the payments to Kohler in excess of the contribution fall squarely within the reach of the Minnesota avoidance statute cited above.  Sun Country did not receive reasonably equivalent value for the payments made to Kohler and the payments were made while the Debtor was unable to satisfy the outstanding creditor claims and other obligation.

## PRAYER FOR RELIEF

62.    WHEREFORE, Plaintiff Committee respectfully requests entry of judgment in favor of the estate as follows: notwithstanding the provisions of any instrument or document, or any agreement, recharacterizing as contributions to the Debtor's equity, obligations purportedly incurred by Sun Country to Kohler under the Investment Agreement and disgorging the value of all amounts paid on account of such claims;

63.    against Kohler disallowing any claims filed by or scheduled for Kohler;

64.    against Kohler awarding the Committee, on behalf of the Debtor's estate, an amount representing the amounts already received by Kohler on account of his alleged claims in excess of the initial contribution under the Bankruptcy code and Minnesota law;

65.    against all Defendant awarding the Committee, on behalf of the Debtor's estate, the costs of this action together with reasonable attorney's fees and expenses and such other and further relief as the Court may deem just and proper.


Dated: September 2, 2010                    SONNENSCHEIN NATH & ROSENTHAL LLP

                                           /e/ Carole Neville _____
                                           Carole Neville (admitted Pro Hac Vice)
                                           1221 Avenue of the Americas, 25th Floor
                                           New York, New York 10020
                                           Tel: (212)768-6700
                                           Fax: (212)768-6800
                                           *Counsel for the Official Committee*
                                           *of Unsecured Creditors*

                                                - and -

                                           RICKE & SWEENEY, P.A.

                                           By:    /e/ Larry B. Ricke _____
                                           Larry B. Ricke (#121800)
                                           Suite 600, Degree of Honor Building
                                           325 Cedar Street St. Paul, MN 55101
                                           Tel: 651-292-3358 Fax: 651-223-8003
                                           *Attorneys for the Official Committee of Unsecured-*
                                           *Creditors of MN Airlines, LLC d/b/a Sun Country*

# EXHIBIT A

# SUN COUNTRY VIP CLUB INVESTMENT AGREEMENT

MN Airlines, LLC dba Sun Country Airlines, a Minnesota Limited Liability Company (hereinafter "SCA"), and Gary S. Kohler, (hereinafter "INVESTOR") hereby enter into this Investment Agreement (the Agreement) effective the 23rd day of December, 2003.

## RECITALS

MN Airlines, LLC dba Sun Country Airlines has entered into a Joint Marketing Agreement with Accredited Only, Inc., in order to establish a membership marketing program for Sun Country Airlines (the Sun Country "VIP Club").

INVESTOR owns certain intellectual property related to the subscription based pricing model employed by the VIP Club

INVESTOR wishes to help SCA fund the startup expenses of the VIP Club through an investment of $105,000.00, in exchange for payments from SCA to be derived from dues paid by members in the VIP Club.

## AGREEMENT

INVESTOR agrees to contribute the sum of One-Hundred Five Thousand Dollars ($105,000.00) to the startup expenses of the VIP Club upon execution of this Agreement.

SCA agrees that it shall pay INVESTOR the sum of $3.00 per membership in the VIP Club, per month, over the life of the VIP Club, as consideration for INVESTOR's initial investment and for providing SCA with the idea for the VIP Club.

## ACKNOWLEDGEMENTS

Both Parties acknowledge that INVESTOR's investment pursuant to this Agreement does not in any way create an ownership interest in SCA beyond any ownership interest which INVESTOR may already possess.

Both Parties acknowledge that INVESTOR shall be entitled to additional compensation for the management of the VIP Club.

Both Parties acknowledge that the term of this Agreement shall begin on the effective date described above and end on the date on which SCA terminates the VIP Club program.

COPY

## MISCELLANEOUS

This Agreement may be executed in two counterparts, each of which shall be considered to be an original.

This Agreement shall be construed according to the laws of the State of Minnesota, without regard to that State's conflicts of laws provisions.

IN WITNESS WHEROF, the Parties have affixed their signatures below.

INVESTOR                                  MN Airlines, LLC dba Sun Country Airlines

_____          By: _____
Gary S. Kohler                            Its: _____
                                               **Shaun P. Nugent**
                                               **Chief Financial Officer**

2

# EXHIBIT B

# JOINT MARKETING AGREEMENT
## Sun Country Airlines dba MN Airlines, LLC and Accredited Only, Inc.

This Joint Marketing Agreement (hereinafter "the Agreement") is entered into this 20th day of February 2004, between MN Airlines, LLC dba Sun Country Airlines, a Minnesota limited liability company (hereinafter "SCA") and Accredited Only, Inc., a Minnesota corporation (hereinafter "AO")

WHEREAS, the parties to this Agreement wish to jointly create and manage a subscription membership program for Sun Country Airlines (hereinafter the "Joint Venture");

THEREFORE, in exchange for the good and valuable consideration noted herein, the parties hereby agree as follows:

## AO RESPONSIBILITIES:

1. Design of a web site, and the services of the AO technicians to work with SCA to integrate the site and the booking engine with the current SCA web site.
2. A value benefit portfolio, to include hotel benefits, restaurant benefits and other miscellaneous product and service benefits.
3. All marketing and marketing expenses (any marketing SCA chooses to initiate that will incur an expense to AO, must be approved by AO in advance.)
4. All billing and data processing for the Joint Venture.
5. Design of a marketing brochure, newsletter and a welcome package for prospective members of the Joint Venture.
6. Customer service call center
7. Ongoing program and benefit management support with recommendations as necessary to ensure that the Joint Venture maintains the highest standards for its members.

## SCA RESPONSIBILITIES:

### Membership fees and fare structure:

1. SCA shall establish pricing for Joint Venture membership and fare pricing.

    a. Initial initiation fees are expected at $99 plus $12 per month (Individual)
        i. December 31, 2004 SCA has the right to change the membership fees at its sole discretion, but with a sixty-day notice to AO.
2. SCA shall provide Joint Venture with airfares that are 'usually' more favorable than those generally available to the public.

        i. March 1, 2004 all VIP fares will be $29 plus 9 cents per mile
        ii. December 31, 2004 SCA has the right to change the pricing to $39 plus 10 cents per mile.
        iii. December 31, 2004, International fees and surcharges may be added, or International flights may eliminated totally from the VIP Club at SCA's sole discretion.

iv. Beyond December 31st 2005, SCA has the right to price the fares at its sole discretion.

## Products and services provided to the Joint Venture:

1. SCA shall provide technical support to allow development and integration of the Joint Venture web site and booking engine with the SCA web site.
2. SCA shall provide booking and credit card billing for booking of flights.
3. SCA shall provide occasional advice and assistance to AO in marketing the Joint Venture, including making selected flight attendants and call center personnel available for marketing training.
4. SCA shall provide relevant content for Joint Venture newsletter and any changes to club rules in a timely manner.

## FEES:

1. AO will pay SCA $35 per member

2. AO will retain an operations fee of $4.65 per membership, per month up to 9,999 members, an operations fee $3.25 per month for 10,000 to 24,999 members and $2.75 per month of all members over 25,000.

3. SCA will pay AO $1.00 for every airline ticket booked through the Joint Venture.

All revenues of the Joint Venture shall be the property of SCA minus the said operations fee and commissions.

## TERM

The term of this Agreement shall commence on the effective date as noted above and continue for three years, unless the Sun Country VIP program is terminated at any time prior to the three years by MN Airlines, LLC dba Sun Country Airlines.

## CONFIDENTIALITY

Each party acknowledges that it will receive confidential information and trade secrets (the "Confidential Information") from the other party in the course of performing their obligations under this Agreement. The Confidential Information shall be deemed to include all the information one party receives from another, except anything that is designated as not confidential. Each party agrees to maintain the secrecy of the other party's Confidential Information and agrees not to disclose it to anyone who does not have a need to know it to perform under this Agreement. Confidential Information does not include any information which is publicly available at the time of disclosure or which subsequently becomes publicly available through no fault of the recipient party, or is rightfully acquired by the recipient party from a third party who is not in breach of an agreement to keep such information confidential. SCA expressly recognizes that AO may become aware of business opportunities offered to the Joint Venture from third parties, and gives AO permission to use such information in the general course of AO's business for other AO clients.

## INDEMNIFICATION

The parties shall indemnify, defend and hold each other, including their affiliates, officers, directors employees and agents, harmless from and against all losses, costs (including attorneys' fees and expenses), liabilities, damages, suits or causes of action of whatever type, including but not limited to damage or destruction of property, injury (including death) to any person or persons, which result or arise from the negligence or omission of the indemnifying party's performance under this Agreement.

## OWNERSHIP OF TRADEMARKS, PATENTS AND COPYRIGHTS

SCA shall maintain the ownership of trademarks or copyrights associated with or developed for this Agreement, including the rights to the name chosen to market the Joint Venture.

## CONDITION PRECEDENT

This Agreement shall take effect upon execution of a separate Joint Venture Investment called the "Sun Country VIP Club Investment Agreement." The terms of which shall include that Mr. Gary Kohler will provide the Joint Venture with $105,000 in start-up funding, in exchange for ongoing payments to be negotiated directly between Mr. Kohler and SCA, and derived from memberships in the Joint Venture.

Accepted and Agreed as of the effective date noted above:

**ACCREDITED ONLY, INC.**                    **MN AIRLINES, LLC**

By: _____          By: _____

Its: _Presidnt /CEO_                  Its: _____

                                            **Shaun P. Nugent**
                                    **Chief Financial Officer**

# EXHIBIT C

# JOINT MARKETING AGREEMENT

This Joint Marketing Agreement (hereinafter "the Agreement") is entered into this day June, 1 2007, between MN Airlines, LLC dba Sun Country Airlines, a Minnesota limited liability company (hereinafter "SCA") and Accredited Only, Inc., a Minnesota corporation (hereinafter "AO").

WHEREAS, the parties to this Agreement have jointly managed a subscription membership program for Sun Country Airlines (hereinafter the "Joint Venture") since 2004, and the parties wish to continue to jointly manage such a program for the term set forth below;

THEREFORE, in exchange for the good and valuable consideration noted herein, the parties hereby agree as follows:

**AO will provide the following products and services to the joint effort:**

1. Continue to provide the current services of website AO technicians to work with SCA to integrate the AO site and the booking engine with the current SCA web site.
2. A high value benefit portfolio, to include restaurant benefits and other miscellaneous product and service benefits.
3. All billing and data processing for the Joint Venture.
4. Customer service call center.
5. Ongoing program and benefit management support and recommendations as necessary to ensure that the Joint Venture maintains the highest standards for its members.
6. AO will assist SCA in integrating the Joint Venture program with the SCA frequent flyer program, on a schedule to be jointly determined by the parties.

**SCA will provide the following products and services to the joint effort:**

1. SCA shall establish pricing for Joint Venture membership.
2. SCA shall provide Joint Venture with air fares that are more favorable than those generally available to the public. SCA shall continue to offer a flat fee plus mileage based fares, and the ability to draw in the lowest SCA fare.
3. SCA will provide reasonable marketing efforts to the Joint Venture program.

**FEES**

SCA shall pay AO the following:

1. Thirty percent (30%) of all program revenues, including initiation fees and monthly dues.

2. SCA shall pay AO $1.00 for every airline ticket booked through the Joint Venture.
3. A monthly stipend of $16,667.00 during the term of the contract.
4. An additional monthly stipend of $6,950 during the first year of the term of the contract, to reimburse AO for fifty percent of its estimated expenses for rebranding due to SCA's implementation of the frequent flyer program. If AO's actual expenses for rebranding are less than the estimated amount ($166,800), then the amount of the monthly reimbursement shall be reduced proportionately. After year one, any further rebranding, frequent flyer program extensions or changes at the sole discretion of SCA will be charged back to SCA at cost.

All revenues of the Joint Venture shall be the property of SCA, and shall be paid to SCA monthly, by the 15th of the following month.

## TERM

The term of this Agreement shall commence on the effective date as noted above and continue for three years, unless sooner terminated for cause.

## PASSENGER DATA

AO shall ensure that SCA has complete access to all passenger data and membership information created by activities of the Joint Venture, with the exception of credit card and billing data.

## CONFIDENTIALITY

Each party acknowledges that it will receive confidential information and trade secrets (the "Confidential Information") from the other party in the course of performing their obligations under this Agreement. The Confidential Information shall be deemed to include all the information one party receives from another, except anything that is designated as not confidential. Each party agrees to maintain the secrecy of the other party's Confidential Information and agrees not to disclose it to anyone who does not have a need to know it to perform under this Agreement. Confidential Information does not include any information which is publicly available at the time of disclosure or which subsequently becomes publicly available through no fault of the recipient party, or is rightfully acquired by the recipient party from a third party who is not in breach of an agreement to keep such information confidential. SCA expressly recognizes that AO may become aware of business opportunities offered to the Joint Venture from third parties, and gives AO permission to use such information in the general course of AO's business for other AO clients.

**TERMINATION**

In the event that SCA decides at its sole discretion to terminate VIP or future iterations of the VIP before the term of this contract has expired, SCA will be responsible for any financial liability associated with this termination or wind down.

**INDEMNIFICATION**

The parties shall indemnify, defend and hold each other, including their affiliates, officers, directors, employees and agents, harmless from and against all losses, costs (including attorneys' fees and expenses), liabilities, damages, suits or causes of action of whatever type, including but not limited to damage or destruction of property, injury (including death) to any person or persons, which result or arise from the negligence or omission of the indemnifying party's performance under this Agreement.

**OWNERSHIP OF TRADEMARKS, PATENTS AND COPYRIGHTS**

AO shall retain ownership of the AO website, the interface with SCA's booking engine, and all software, hardware and systems developed or acquired by AO, whether for this Agreement or otherwise, other than items provided by SCA at its own direct cost.

SCA shall retain ownership of all trademarks or copyrights associated with or developed for this Agreement, including the rights to the name "Sun Country VIP Club" and any other name chosen to market the Joint Venture.

**PROGRAM DESIGN**

Except as limited by the terms of this Agreement, SCA shall have complete control over the program design and features, including customer pricing.

Accepted and Agreed as of the effective date noted above:

**ACCREDITED ONLY, INC.**                    **MN AIRLINES, LLC**

By: _____               By: _____
Its: President /CEO                               Its: Vice President

# EXHIBIT D

B10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT District of Minnesota | PROOF OF CLAIM |
|---|---|

| Name of Debtor: MN AIRLINES, LLC | Case Number: 08-35197 |
|---|---|

**NOTE:** *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

KOHLER, GARY S.

Check here if this claim
___ replaces
___ amends
a previously filed claim.

Court Claim Number:
(if known)

Dated:

RECEIVED
09 MAR -6 AM 11: 23
US BANKRUPTCY COURT
ST PAUL MN

Name and address where notices should be sent:
KOHLER, GARY S.
11554 CEDAR PASS
HOPKINS MN 55305-2969

Telephone number:

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

1. Amount of Claim as of Date Case Filed:   $244,311.00

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. Basis for Claim: Royalty on VIP / PLUS program
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

Value of Property: $_____  Annual Interest Rate ___%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____  Basis for perfection:

Amount of Secured Claim: $_____  Amount Unsecured: $_____

6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Send original to:
U.S. Bankruptcy Court
200 Warren E Burger Federal Bldg &
U.S. Courthouse
316 North Robert St.
St. Paul, MN 55101

## SUN COUNTRY VIP CLUB INVESTMENT AGREEMENT

MN Airlines, LLC dba Sun Country Airlines, a Minnesota Limited Liability Company (hereinafter "SCA"), and Gary S. Kohler, (hereinafter "INVESTOR") hereby enter into this Investment Agreement (the Agreement) effective the 23rd day of December, 2003.

### RECITALS

MN Airlines, LLC dba Sun Country Airlines has entered into a Joint Marketing Agreement with Accredited Only, Inc., in order to establish a membership marketing program for Sun Country Airlines (the Sun Country "VIP Club").

INVESTOR owns certain intellectual property related to the subscription based pricing model employed by the VIP Club

INVESTOR wishes to help SCA fund the startup expenses of the VIP Club through an investment of $105,000.00, in exchange for payments from SCA to be derived from dues paid by members in the VIP Club.

### AGREEMENT

INVESTOR agrees to contribute the sum of One-Hundred Five Thousand Dollars ($105,000.00) to the startup expenses of the VIP Club upon execution of this Agreement.

SCA agrees that it shall pay INVESTOR the sum of $3.00 per membership in the VIP Club, per month, over the life of the VIP Club, as consideration for INVESTOR's initial investment and for providing SCA with the idea for the VIP Club.

### ACKNOWLEDGEMENTS

Both Parties acknowledge that INVESTOR's investment pursuant to this Agreement does not in any way create an ownership interest in SCA beyond any ownership interest which INVESTOR may already possess.

Both Parties acknowledge that INVESTOR shall be entitled to additional compensation for the management of the VIP Club.

Both Parties acknowledge that the term of this Agreement shall begin on the effective date described above and end on the date on which SCA terminates the VIP Club program.

## MISCELLANEOUS

This Agreement may be executed in two counterparts, each of which shall be considered to be an original.

This Agreement shall be construed according to the laws of the State of Minnesota, without regard to that State's conflicts of laws provisions.

IN WITNESS WHEROF, the Parties have affixed their signatures below.


INVESTOR                                    MN Airlines, LLC dba Sun Country Airlines


Gary S. Kohler                              By: _____
                                            Its:    **Shaun P. Nugent**
                                                    **Chief Financial Officer**

2

Thursday, March 05, 2009


To:  Lori Vosejpka

Enclosed please find an attachment to the claim sent previously for the Sun Country Airlines claim from:


Gary S. Kohler
11554 Cedar pass
Hopkins, MN 55305-2969


Please add this as further proof of the claim.